**UNITED STATES, Appellee**

v.

**Israel B. POLLARD, Sergeant
U.S. Army, Appellant.**

**Nos. 67,996,
CMR No. 9003250.**

U.S. Court of Military Appeals.

Argued Feb. 2, 1993.
Decided Sept. 27, 1993.

For Appellant: *Captain Lawrence W. Andrea* (argued); *Colonel Malcolm H. Squires, Captain Robin L. Hall, Captain Mark L. Toole* (on brief).

For Appellee: *Major Joseph C. Swetnam* (argued); *Colonel Dayton M. Cramer* and *Lieutenant Colonel Joseph A. Russelburg* (on brief).

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of committing indecent acts with his 13–year–old stepdaughter (hereinafter referred to as "M"), on or about May 19, 1990. The approved sentence provides for a bad-conduct discharge and confinement for 2 years. The

Court of Military Review affirmed the findings but reduced the confinement to 18 months because of prejudicial error during the sentencing proceedings. 34 MJ 1008.

The granted and specified issues are:

I

WHETHER THE MILITARY JUDGE ERRED IN ADMITTING THE HEARSAY STATEMENTS OF [J] AND [N] UNDER THE RESIDUAL HEARSAY EXCEPTION, MIL.R.EVID. 803(24), WHERE THE STATEMENTS POSSESSED NEITHER PARTICULARIZED GUARANTEES OF TRUSTWORTHINESS NOR ADEQUATE INDICIA OF RELIABILITY REQUIRED FOR ADMISSIBILITY.

II

WHETHER THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE FINDINGS OF GUILTY [FOR COMMITTING INDECENT ACTS] WHERE THE ONLY PROBATIVE GOVERNMENT EVIDENCE WAS OFFERED AS EVIDENCE OF A PRIOR INCONSISTENT STATEMENT, AND COULD NOT BE CONSIDERED AS EVIDENCE OF THE TRUTH OF THE MATTERS CONTAINED IN THAT STATEMENT.

III

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION AND SUBSTANTIALLY PREJUDICED APPELLANT'S RIGHT TO A FAIR TRIAL BY ADMITTING [M]'S INADMISSIBLE HEARSAY STATEMENTS, OFFERED UNDER THE GUISE OF IMPEACHMENT, WHERE THE OBVIOUS PRIMARY GOVERNMENT PURPOSE WAS TO PLACE IMPERMISSIBLE HEARSAY BEFORE THE MEMBERS.

Specified Issue

WHETHER PLAIN ERROR OCCURRED WHEN A WITNESS [ANN] WAS ALLOWED TO TESTIFY TO AN EXCITED UTTERANCE BY THE VICTIM, WHICH IMPLIED THAT APPELLANT HAD COMMITTED AN ADDITIONAL UNCHARGED SEXUAL ASSAULT ON THE VICTIM.

On May 24, 1990, Ann W. was visiting at M's home, where appellant also lived. Both Ann and M were 13 years old at the time. Ann testified that appellant called M into his bedroom "two or three times," and they remained there for "30 or 20 minutes or so" each time. When M came out of the bedroom, "She didn't look her regular self.... [I]t seemed like something was wrong.... Her eyes were real watery and she just didn't look the same." Ann asked M several times what was wrong and M repeatedly replied, "Nothing." Finally M began crying. Ann again asked what was wrong, and M told her "that her father has been messing with her and stuff."

Ann and M left the house and went to visit a friend of Ann's family, Mr. James Hereford, whose nickname is "Coach." Coach testified that he was about to drive away from Ann's house in his van when Ann approached and said, "[M] has something." Ann and M entered the van; M "started crying," and "she proceeded to tell [him] some things that were happening with her stepfather." Coach testified that M told him that her stepfather was "[t]ouching, licking her where he had no business, things such as that." Coach Hereford suggested that M "write [him] a note," because he thought it would "give her time to think," in case she was not being truthful. M wrote a note and gave it to Coach on the following day, May 25. The handwritten note reads in pertinent part as follows:

> My dad is touching me where is not nessecry [sic]. He ask me at night if he can see my upper part, I say no so he ask me to see the bottom part. I say no. He gets mad and go in his room. When he come back he say just this one time and I will leave you for the rest of my life. He keep on saying that but the next night he does the same thing and this is what he does: touch my upper part stick his fin-

gers in my lower part and lick it. The reason how I can stop him is by calling my sister. I wish he would stop. My name is [M]. I am 13 years old.

Coach Hereford gave the note "to the juvenile authorities at the Killeen Police Department." On May 30, 1990, Officer Pamela Jones, a specially trained child sexual abuse investigator with the Killeen Police Department, interviewed M; her 9–year–old brother, J; and her 6–year–old sister, N.

Officer Jones interviewed N first. Also present during the interview was a social worker with the Department of Human Services, Lori Mason. At the beginning of the interview, N appeared "afraid." According to Officer Jones:

> She got into the corner of the room, as far as she could, and pulled her knees up to her chest. She was sitting on the floor—we were all three sitting on the floor—pulled her knees up to her chest, and she'd wrap her arms around her knees and just cuddled up in a little ball. At times she would place her hands, her fingers—at times almost her whole fist—in her mouth, she would place her foot in her mouth, and eventually took her shoe off and started chewing on her shoe.

Officer Jones began the interview with "just neutral questions about school and family," but N "was even reluctant to answer those questions." When Officer Jones asked N why should would not talk, "she would just shrug, place her shoe in her mouth." Finally, Officer Jones asked N "did somebody tell her not to tell me something, or to tell me something, and she said yes, and she said her mother. But she couldn't tell me what it was that she was not supposed to tell me."

Officer Jones then left the room and asked Mrs. Pollard to "explain to [N] to tell me the truth, and she said she would." Officer Jones testified that "I went and got [N], walked back in the room, all within a matter of seconds, and Mrs. Pollard was moaning and crying, and the child appeared even more afraid, and she kept grabbing

[N], telling her, 'You tell me the truth. You tell me the truth, now.'"

Because N "still wouldn't open up," Officer Jones brought M into the room to reassure N. M told N, "go ahead and talk to them about what happened," but N "was just climbing down in her shirt." N's first response was to a question addressed to M. When Officer Jones asked M "who was present in the room when this happened to you," N said, "Me." N then picked up "the natural dolls," and when Officer Jones asked her to show "what happened to" M, N "laid the female doll flat on the floor, and then she took—on its back—and she took the adult male doll and she placed its mouth on the vagina of the female doll, and laid it down on the floor on top of the female doll." Officer Jones testified that N positioned the dolls without any help or participation by anyone in the room.

N's demeanor then changed, and "[s]he became more open, almost relieved that she had spoken." While the remaining interviews were being conducted, "she was very open with the other investigators in the office, and very open with [Officer Jones] and Miss Mason after that point and time."

Miss Mason corroborated Officer Jones' description of N's demeanor and responses. She testified that it took "a half hour, maybe more" to get N to start talking. Miss Mason testified that N did not seem rehearsed and "was detailed in what she had seen," and the details of her statement were internally consistent. N's statement was not reduced to writing.

Officer Jones next interviewed M, the alleged victim. Before she interviewed M, Officer Jones told M that she was going to take a sworn statement and "explained to her the consequences of lying."

Miss Mason, who was present but did not participate in M's interview, described the beginning of the interview as follows:

> When [M] first came into the interview, she was very quiet. She sat there with her arms crossed against her body and she was looking down. She didn't talk. If Officer Jones asked her any questions, she just nodded her head or shook her

head. Officer Jones asked her, at one point, if she would feel more comfortable writing her answers down on a piece of paper and she indicated that she would, so she was given a piece of paper and she wrote her answers down.

Officer Jones questioned M about the letter she had written to Coach and asked her, "Has anybody hurt you in any way?". Miss Mason testified that M's account "started flowing from the first time that she started writing her questions on the piece of paper—she started answering the questions, and then it was—she just kept answering the questions that Officer Jones asked her after that." Miss Mason testified that the details of M's account were internally consistent and did not appear rehearsed. Asked to explain why M did not appear to have been rehearsed, Miss Mason testified:

> Because to me, at first, when [M] was sitting there, once again, she was very quiet, was afraid to speak, and then when she got to the point where she felt comfortable, she was detailing what had happened to her, she was able to answer questions, she didn't really hesitate to answer any of the questions that we asked her. She didn't stop and think about it, she just answered the questions.

Officer Jones testified that M swore that the statement was "true and correct." She did not "tell" M "that she had to sign the statement" or threaten M with "any consequences from her refusing to sign the statement." Miss Mason also testified that Officer Jones did not "threaten" the children, tell that they were required to sign their statements, or tell them what to say.

In her sworn statement M related the following:

> At night my dad calls me in his room when my mom is not there. I sit on the bed and he lays me down. He lifts up my t-shirt and he pulls my sweat pants and underwear down. He sucks on my titties and he puts his fingers inside my lower part, my cat. He also puts his mouth on my cat and he licks and sucks on it. He puts his fingers inside my cat when he does this. He puts his fingers and tongue inside my cat.... The weekend before I told Coach Hereford what my dad does, my mom was gone. During the day on Saturday the 19th of May 1990 I was alone with dad in his room. [N] and [J] and [E] kept coming in and out of the room. My dad moved the leg of my shorts over to the side and he put his fingers in my cat and he licked my cat with his tongue. [N] and [J] and [E] saw this. [N] and [J] said that my dad was licking my pussy and my dad told them that he wasn't....

After the interviews with M and N were completed, Miss Mason took the two children home and waited for J to come home from school. When J came home, Miss Mason brought him to the police station. Officer Jones testified that, when Miss Mason brought J to the station, she reported "that Mrs. Pollard had gone into the kitchen and [J] had followed her; that Mrs. Pollard had shut the door behind them. She didn't know what had been said during that time, but she said they were only there a very short time, so she doubted that any coaching went on."

Officer Jones testified that J "acted as if he were afraid of something." He was talkative about "neutral things" and "good touches/bad touches," but "when I asked him if he knew of anybody else that had ever gotten any bad touches, he really got quiet and got tears in his eyes." Without disclosing what they had said, Officer Jones told J that she "had already talked to" M and N. Officer Jones testified that "[h]e started crying very hard then, and he told me that his mother had told him that if he told me about his father, that he would be placed in a foster home and never get to come back home." Officer Jones testified that she "reassured [J] that he was not in any trouble, and that if somebody was being hurt, that we all needed to help out to make sure that the hurt stopped, and that's when he went ahead and spoke to me about witnessing the sexual abuse." J's statement was reduced to writing and sworn. In his sworn statement, J stated:

I looked in the bedroom and saw [M] on her stomach. Daddy was on his back laying under [M]'s private. He was licking her private. Daddy had on clothes. [M] had her underwear down and a nightshirt on. I told [M] that I was going to tell my mom, then I told my mom. She spanked [M] for letting him do that. She told my dad that she didn't want him in the bedroom.

Miss Mason corroborated Officer Jones' description of J's demeanor and responses. Regarding her own interaction with J, Miss Mason testified:

I didn't ask him any of the questions. I just sat there. But towards the end, when I was—he was reading his statement and trying to make corrections and stuff, we were talking and I was reading the statement along with him, and he was making corrections.

Miss Mason described J's demeanor as "[q]uiet at first," but after he began to talk, "he kept asking for candy," and "[h]e got very happy, very playful, just like the others." Miss Mason testified that J also did not appear to have been rehearsed.

On May 31, the day following her first interview with Officer Jones, M called Officer Jones and told her that her statement of May 30 was a lie designed "to get [her] stepfather in trouble." On June 4, 1990, M executed a second sworn statement in which she stated that her first statement, dated May 30, "was true" and the facts related in her letter to Coach were "true."

The military judge admitted the pretrial statements of J and N under the residual hearsay rule of Mil.R.Evid. 803(24), Manual for Courts–Martial, United States, 1984. He refused to admit M's pretrial statement of May 30, ruling that it lacked the particularized "circumstantial guarantees of truthworthiness" required by Mil.R.Evid. 803(24). He made extensive findings of fact and conclusions of law, including the following:

Throughout all interviews, Mrs. Lori Cunningham [referred to as Lori Mason, her maiden name, during the early parts of the trial] was present. The undisput-

ed evidence establishes that Officer Jones asked opened-ended, non-leading questions and repeatedly stressed truthfulness. Conversely, there is no evidence of suggestiveness or improper influence. Accordingly, I am convinced that the children's statements were voluntary reports of matters within their knowledge and the contents of their statements were not substantially influenced by the words or behavior of Officer Pamela Jones or Mrs. Lori Cunningham.

Beginning with [N]'s out-of-court statement, I find that it has particularized circumstantial guarantees of truthworthiness and is thus admissible. The child's tender years and exhibited state of maturity, when compared with the subject matter and detail of her out-of-court statement, serve as an exceptionally strong circumstantial guarantee of trustworthiness. As echoed by the testimony of Mrs. Lori Cunningham, a 6 year old would have to witness such an event to report it with such accuracy.... [N]'s accurate portrayal of the reported sexual acts with the anatomically correct dolls adds credence to both the opinions of Mrs. Cunningham and the verity of her statement. Next, [N]'s behavior during the interview further echoed the reliability of her report. Given these more significant factors surrounding the making of [N]'s out-of-court statement, as well as numerous other less significant factors, I am convinced that its probity is sufficiently established to permit its presentation to the triers of fact.

Next, I find that [J]'s out-of-court statement possesses circumstantial guarantees of truthworthiness sufficient for its submission to the triers of fact. At the time of [J]'s out-of-court statement, he fully appreciated the necessity to tell the truth and avoid a false accusation. The accuracy of his sworn statement is established by his careful review of its contents. Yet, the most significant circumstantial guarantee of trustworthiness of [J]'s out-of-court statement was

that the content of the report was patently against his interest. [J]'s emotional state as evinced by his "hard crying" and his report that his mom said that he would "have to go to a foster home and would never be able to go back home [if the sexual allegations against his father were true]," vividly present the tension. It is patent that [J] believed that his life would be substantially altered, contrary to his desires, if he reported this abuse. Notwithstanding this, [J] then detailed his father's sordid acts with [M]. It is hard to imagine any statement more against a child's interest than the instant one. Unlike adults, children do not perceive statements concerning finances or crimes to be against their interest, but it is clear from [J]'s behavior that he fully realized that his report of abuse would adversely alter his life. Such reality would weigh heavily against fabrication and strongly favor truthfulness.

\* \* \*

I hasten to add that following the *ratio decidendi* of *Idaho v. Wright*, [497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)], corroborative evidence was not considered in determining the admissibility of the instant out-of-court statements into evidence.

During her case-in-chief on the merits, trial counsel requested and received permission to treat M as "a hostile witness." As she had done in the hearing to determine admissibility of her pretrial statements, M recanted. M testified that appellant had never abused her. She denied telling Ann that appellant "had been doing bad things" to her. She admitted writing the letter to Coach but testified that it was "like a [sic] essay" and not true. She testified that her written statement of May 30 was not true; she had not told Officer Jones about sexual abuse; that she did not read the statement before signing it.

In the presence of the court members, trial counsel questioned M by quoting extensively from her statements. Referring to the letter to Coach, trial counsel asked M, "So when you said, 'He touches my upper part and he sticks his fingers in my lower part and he licks it,' you're lying there?" M responded in the affirmative.

Referring to M's statement of May 30 to Officer Jones, trial counsel asked M, "[D]idn't you tell Officer Jones that the accused had licked your vagina on 19 May 1990?" M responded, "No." After M denied saying what was in the statement, trial counsel questioned her as follows:

Q. So when you put down on here that, "My dad came in, and [N] and [J] were in the room, and I was teaching my brother some stuff, and I got up and my dad pulled me down on the bed and started touching me," you never really said that?

A. No.

\* \* \*

Q. Now, on here it says, "At night my dad calls me into his room when my mom is not there. I sit on the bed and he lays me down. He lifts up my T-shirt and he pulls my sweat pants and underwear down. He sucks on my titties and puts his fingers inside my lower part, my cat. He also puts his mouth on my cat and licks it and sucks on it." Did you ever tell Officer Jones that?

A. No. I don't know what she's talking about, a cat.

The defense then requested a side-bar and objected on the ground that trial counsel was "back-dooring the ruling" on admissibility of M's pretrial statements.

The military judge then admitted M's written statements of May 30 and June 4 and her letter to Coach as prior inconsistent statements. Immediately after admitting the letter to Coach, he instructed the court members that the statement could be used "only for one purpose, and that is to determine the credibility of this witness." He further instructed the members, "You may not, however, consider this prior statement, . . ., as evidence of the truth of the matter contained in the statement. Now, I will repeat that statement a little bit later, but right now you are advised that it's limited. It's limited only to the issue of credibility." The military judge asked if

any court member had questions about his ruling and received a negative response. He asked if all court members understood "the limited use of such evidence" and received an affirmative response.

Regarding M's statements of May 30 and June 4, the military judge gave the members the following instruction immediately after admitting the statements:

> Court members, you are also advised that these statements are admitted only for the purposes of determining the credibility of this particular witness. You may not consider the prior statements as evidence of the truth of the matters contained in the prior statements. You may only consider them in evaluating the believability of the testimony of [M], the witness who is presently on the stand. I'll give you additional instructions at a subsequent time.
>
> Do all of the court members understand that ruling?

All members responded in the affirmative.

J also testified at trial that his written pretrial statement describing what appellant did to M was not true. He denied describing the incident to Officer Jones, said that he did not read the statement before signing it, and that it was untrue. J testified that Officer Jones threatened to "put me in a juvenile home if I didn't sign it."

N also recanted her earlier statements at trial. She was uncommunicative and answered most questions by shaking or nodding her head. She denied telling Officer Jones that appellant had abused her or her sister, M. Asked whether Officer Jones and Miss Mason gave her some dolls, N responded, "I don't know." Asked if she told them anything, she responded, "No." Asked, "What did you do while you were there?", she responded, "I don't know." When trial counsel asked if Miss Mason "would ... be lying" if she said that M used dolls to show what happened to M, N answered, "Yes."

Major Thomas G. Hardaway, M.D., a psychiatrist, testified as an expert witness for the prosecution. He had not examined or interviewed M, N, J, or their parents but testified only generally about "patterns of behavior" in child abuse cases. He testified that when the abuser is a "family member or a trusted friend," children, for the most part "are reluctant to reveal ongoing abusive behavior towards them."

On the question of recantation, Major Hardaway "testified that children recant sometimes because of pressure exerted on them by parents." He stated that pressure can be "very implicit," coming "just from the guilt felt by the child or perceived possible endangerment to the figure that's involved." He also stated that sometimes children recant because "they lied originally." He explained that there are "certain red flags" which raise the possibility that a child may be lying for "revenge or retaliation" and that there are more instances of adolescents making false accusations against parents than there are with younger children.

Appellant's mother-in-law testified for the defense. She stated that M had been a problem child and that she "had some problems with her about telling the truth." Appellant did not testify.

In his instructions on findings, the military judge again referred to M's two pretrial statements and the letter to Coach. He instructed the members:

> The prosecution's theory in this case appears to be that the in-court statements of [M]—and they were words to the effect that her father never licked or put his tongue in her vagina—were lies, and that she recanted her prior statements.... Those out-of-court statements were introduced for the limited purpose of you determining the credibility of [M]. In other words, to determine the truthfulness of her in-court statement; to wit, her father never licked or put his tongue in her vagina. Further, according to the prosecution's case, the truth is found in the out-of-court statements made by [J] ... and the oral out-of-court statement of [N] to Investigator Jones.

Now, that brings you to another problem of credibility, with regards to the witnesses. Here you must determine the credibility of the out-of-court statements of out-of-court witnesses....

The military judge then instructed the court members on the factors to be considered in determining the credibility of J and N.

The court members found appellant not guilty of specification 1, alleging indecent acts with M from March 15 through May 15, 1990, but guilty of specification 2, alleging indecent acts with M on or about May 19, 1990.

## I. *Residual Hearsay*

Appellant now contends that the military judge erred by admitting the statements of N and J under the residual hearsay exception set out in Mil.R.Evid. 803(24). This exception provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \*　　\*　　\*
>
> (24) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence....

The rule is taken from Fed.R.Evid. 803(24) "without change" and is intended to "be employed in the same manner as it is generally applied in the Article III courts." Drafter's Analysis of Mil.R.Evid. 803(24), Manual, *supra* at A22–51 (Change 2).

The materiality of the statements is not in issue in this case, and there is no question that they were "necessary" to the Government's case. *See United States v. Giambra,* 33 MJ 331, 334 (CMA 1991)

("[e]ven reliable hearsay" not admissible as residual hearsay "unless it is 'necessary.' ") Our focus in this case is on the reliability of the statements.

■ The ruling of the military judge admitting residual hearsay is entitled to "considerable discretion" on appellate review. *United States v. Powell,* 22 MJ 141, 145 (CMA 1986). *See generally* S. Childress and M. Davis, *Federal Standards of Review* § 11.02 at 11–5 to 11–9 (2d ed.1992).

This Court has on occasion expressed reservations about the trustworthiness of "police-station interviews." *See, e.g., United States v. Barror,* 23 MJ 370, 372 (CMA 1987). Nevertheless, we have declined to adopt a rule rejecting statements to police officials as *per se* unreliable. *United States v. Giambra,* 33 MJ at 334; *United States v. Hines,* 23 MJ 125, 136 (CMA 1986).

In *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), the Supreme Court held that the " 'particularized guarantees of trustworthiness' " required by the residual hearsay rule "must be shown from the totality of the circumstances," but that "the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." 497 U.S. at 819, 110 S.Ct. at 3148. Nonexclusive examples of such circumstances include "spontaneity"; "consistent repetition"; "mental state of the declarant"; "use of terminology unexpected of a child of similar age"; and "lack of motive to fabricate." 497 U.S. at 821–22, 110 S.Ct. at 3149.

There may be some question whether, since *Idaho v. Wright, supra,* involved an unavailable declarant, that case precludes consideration of extrinsic corroborating evidence to establish trustworthiness when the declarant testifies, as in this case. *See United States v. Clark,* 35 MJ 98, 107 (CMA 1992)(Crawford, J., concurring). We need not answer that question in this case, however, because we are satisfied, as was the military judge, that the circumstances

surrounding the statements of N and J are themselves sufficient to establish their reliability without reference to extrinsic corroboration.

## A. *N's Statement*

■ N appeared in court and was subjected to cross-examination, although she was withdrawn and generally uncommunicative. *See United States v. Lyons*, 36 MJ 183, 188 (CMA 1992) (Sullivan, CJ; Cox and Crawford, JJ., each concurring separately) (no confrontation issue where witness is available for cross-examination). In evaluating the trustworthiness of N's pretrial statement, the military judge made specific note of N's tender years, accurate and detailed portrayal of sexual acts normally beyond the experience of a 6–year–old, her behavior during the interview, and Officer Jones' use of "opened-ended, non-leading questions" and repeated emphasis on truthfulness. We have noted additionally N's spontaneous response, "Me," when Officer Jones asked M who was present during the abuse. We hold that the military judge did not abuse his discretion in admitting N's statement as residual hearsay.

## B. *J's Statement*

■ J also appeared in court and was subjected to cross-examination. Unlike N, he was responsive to questions. The military judge made specific note of J's careful review and correction of his pretrial statement, his emotional state ("hard crying") while making his pretrial statement, and the fact that "the content of the report was patently against his interest" because he had been told by Mrs. Pollard that he would "have to go to a foster home and would never be able to go back home" if the sexual-abuse allegations against his father were true. We hold that the military judge did not abuse his discretion in admitting J's statement as residual hearsay.

## II. *Sufficiency of the Evidence*

■ The granted issue relating to sufficiency of the evidence presupposes inadmissibility of the residual hearsay statements of N and J. Although N and J referred to multiple indecent acts, appellant was acquitted of specification 1, alleging a course of conduct over a period of 2 months, but convicted of specification 2, alleging an indecent act "on or about" May 19, 1990. The statements of N and J encompass conduct on or about May 19. We will not speculate why the members acquitted appellant of specification 1. *Cf. United States v. Hendon*, 6 MJ 171 (CMA 1979)(speculative arguments regarding sentencing deliberations rejected). Having held that the statements of N and J were admissible, we hold that the evidence is legally sufficient to support the findings of guilty of specification 2 and the Charge. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 MJ 324 (CMA 1987).

## III. *Admission of M's Prior Inconsistent Statement*

■ Appellant contends that the prosecution intentionally called M as a witness on the merits for the primary purpose of placing otherwise inadmissible evidence before the court-martial under the guise of impeachment. The Government responds by arguing that the prosecution legitimately called M as a witness to establish that she was 13 years old. We hold that the military judge abused his discretion.

"Every circuit" which has considered the question has held that "the prosecutor may not use [a prior inconsistent] statement under the guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible." *United States v. Hogan*, 763 F.2d 697, 702 (5th Cir.1985), and cases cited therein. The military judge had already ruled that M's statement would not be admitted as residual hearsay.

Trial counsel's stated motive in this case was transparent. Establishing M's age required one question and answer in the record. Her age could have been established by Mrs. Pollard, Ann, N, or J; by official records; or by stipulation. Trial counsel and the military judge knew beforehand that M would recant her pretrial state-

ments in front of the court members, because she had done so in the hearing on admissibility of her pretrial statements. Trial counsel requested and received permission to treat M as "a hostile witness."

After establishing her name, address, and age, trial counsel examined her at length about her spontaneous statement to Ann, which M denied; her abuse at the hands of appellant, which she denied; her conversation with Coach in his van, which she disputed; the truthfulness of her letter to Coach, which she disputed; and her two statements to Officer Jones, which she repudiated. Trial counsel repeatedly read substantive portions of M's statement and then asked, "Did you ever tell Officer Jones that?"

The net result was that all pertinent portions of M's statement were read to the court members. We hold that the military judge abused his discretion by permitting trial counsel to read most of M's pretrial statements, in the presence of the court members, under the guise of impeachment.

## IV. *Uncharged Misconduct*

Appellant argues that it was error for the military judge to permit Ann to testify regarding M's statement on May 24, 1990, "that her father has been messing with her and stuff," because this amounts to bringing out uncharged misconduct. Since the defense did not object on this ground, we must determine whether admission of this testimony by Ann was plain error. Mil. R.Evid. 103(a). We hold that it was not.

The issue is compound, involving two questions: (1) Did M's statement qualify under Mil.R.Evid. 803(2) as an excited utterance? and (2) did M's statement violate Mil.R.Evid. 404(b) by introducing evidence of uncharged misconduct? The parties do not dispute that the statement was an excited utterance, but they disagree on the "uncharged misconduct" issue.

Mil.R.Evid. 404(b) provides: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." The rule also pro-

vides that such evidence may "be admissible for other purposes."

■ We hold that Mil.R.Evid. 404(b) was not violated, because Ann's testimony can reasonably be read, and apparently was understood by the parties, to refer only to the offenses charged. Appellant was charged with a course of conduct beginning on April 15 and ending "on or about" May 19, 1990. M's utterance on May 24 that appellant "has been messing with her" encompassed conduct preceding the May 24 utterance, including that alleged in both specification 1 and specification 2.

■ To constitute plain error, the error must have "not only seriously affected 'substantial rights,' " it also must have "had an unfair prejudicial impact on the jury's deliberations." *United States v. Young,* 470 U.S. 1, 17 n. 14, 105 S.Ct. 1038, 1047, n. 14 84 L.Ed.2d 1 (1985); *United States v. Cousins,* 35 MJ 70, 75 (CMA 1992). To determine whether plain-error has occurred, the claim must be evaluated on the basis of the entire record. *Id.* The plain-error rule should "be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982); *United States v. Cousins, supra.* When, as in this case, plain error is asserted, appellant "bears the burden of persuasion with respect to prejudice." *United States v. Olano,* — U.S. —, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993). We find no plain error in admission of Ann's testimony.

## V. *Conclusion*

■ Having held that the military judge abused his discretion by permitting trial counsel to read M's pretrial statements to the court members, we must determine whether the error requires reversal. Art. 59(a), UCMJ, 10 USC § 859(a). We hold that it does.

■ Before this Court may hold that a finding of guilty is incorrect "on the ground of an error of law," we must hold

that "the error materially prejudices the substantial rights of the accused." Art. 59(a); Mil.R.Evid. 103(a). This requirement is similar to Fed.R.Crim.P. 52(a), which provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

 Once appellant has met his threshold burden of showing that an error has occurred which is "of such a character that its natural effect is to prejudice a litigant's substantial rights," the burden shifts to the Government to persuade us that the error was harmless. *Kotteakos v. United States*, 328 U.S. 750, 760, 66 S.Ct. 1239, 1245, 90 L.Ed. 1557 (1946). *See United States v. Olano*, ── U.S. at ──, 113 S.Ct. at 1778 (contrasting Government's burden of persuasion for harmless error with appellant's burden of persuasion for plain error). In *Kotteakos* the Supreme Court explained the harmless-error rule as follows:

> But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 765, 66 S.Ct. at 1248.

We note that the military judge instructed the court members three times regarding the limited purpose for which M's pretrial statement was being admitted, *i.e.*, to determine the credibility of the victim-witness. "In the absence of evidence" to the contrary, court members are "presumed" to have followed the military judge's instructions. *United States v. Ricketts*, 1 MJ 78, 82 (CMA 1975).

The problem in this case is that, even if the court members followed the military judge's instructions and concluded that the victim was lying in court, they necessarily would also infer that the converse of her blanket recantation was true, *i.e.*, that she had been abused as the prosecution contended and as N and J had described in their pretrial statements, which were already before the court. The court members obviously did not believe that M's in-court recantation was truthful, because they convicted appellant.

This is not a case where the evidence was overwhelming. The prosecution was faced with the task of convincing the court members that the victim and two corroborating witnesses were lying in court. There was no confession or physical evidence. Except for M's pretrial statements, trial counsel's case lacked any incriminating evidence from the victim herself. By allowing trial counsel to read M's detailed pretrial statements to the court members under the guise of impeachment, the military judge allowed trial counsel to corroborate the pretrial statements of N and J with the victim's own statements.

We are not satisfied that the corroborative impact of M's pretrial statements was overcome by the military judge's limiting instructions. We cannot say, with the "fair assurance" required by *Kotteakos*, that trial counsel's improper use of M's two pretrial statements did not have a "substantial influence" on the findings. Accordingly, we must reverse.

### VI. *Decision*

The decision of the United States Army Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and WISS concur.