UNITED STATES, Appellee

v.

Lester C. CASTEEL, Aviation Structural Mechanic (Hydraulics) First Class U.S. Navy, Appellant.

No. 94–1430.
CMR No. 93 00109.

U.S. Court of Appeals for the Armed Forces.

Argued Oct. 31, 1995.

Decided Sept. 30, 1996.

For Appellant: *Captain John F. Havranek,* USMC (argued); *Lieutenant Paul J. Ferdenzi,* JAGC, USNR (on brief).

For Appellee: *Lieutenant John R. Livingston, Jr.,* JAGC, USN (argued); *Commander D.H. Myers,* JAGC, USN (on brief); *Colonel*

*J. Composto,* USMC, *Commander S.A. Stallings,* JAGC, USN, and *Lieutenant Commander David B. Auclair,* JAGC, USN.

## Opinion of the Court

COX, Chief Judge:

A general court-martial comprised of officer and enlisted members at Naval Station Treasure Island, San Francisco, California, convicted appellant, contrary to his pleas, of sodomy on a child under the age of 16 (2 specifications); committing indecent acts upon the body of a child under the age of 16 (3 specifications); taking indecent liberties with a child under the age of 16; and wrongfully endeavoring to impede an investigation by communicating a threat, in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 USC §§ 925 and 934, respectively. The members sentenced appellant to a dishonorable discharge, confinement for 8 years, and reduction to E–1. The convening authority approved the sentence, and the Court of Military Review[1] affirmed the findings and sentence in an unpublished opinion.

We granted review of these issues:

### I

WHETHER ADMISSION OF [AG'S] HEARSAY STATEMENT VIOLATED APPELLANT'S SIXTH AMENDMENT PROTECTION UNDER THE CONFRONTATION CLAUSE WHEN THE STATEMENT LACKED ADEQUATE INDICIA OF RELIABILITY.

### II

WHETHER APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFRONT THE AVAILABLE DECLARANT OF A RESIDUAL HEARSAY STATEMENT WHEN HE WAS NOT AFFORDED AN OPPORTUNITY TO FULLY AND EFFECTIVELY CROSS–EXAMINE THE DECLARANT AFTER THE RESIDUAL HEARSAY STATEMENT WAS INTRODUCED INTO EVIDENCE.

1. *See* 41 MJ 213, 229 n.* (1994).

### III

WHETHER THE NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS ERRED, AS A MATTER OF LAW, WHEN IT AFFIRMED THE MILITARY JUDGE'S RULING TO ALLOW PRIOR MISCONDUCT INTO EVIDENCE UNDER MILITARY RULE OF EVIDENCE 404(b) ON THE BASIS THAT APPELLANT PLACED THE ELEMENT OF INTENT IN ISSUE WHEN DEFENSE COUNSEL CROSS–EXAMINED THE VICTIM ABOUT INNOCENT ACTS OF CONTACT BETWEEN THE VICTIM AND APPELLANT.

Finding no error in the granted issues, we affirm.

### ISSUE I

 The first issue concerns the propriety of the receipt into evidence of a prior out-of-court statement of an alleged victim. Specification 4 of Charge IV alleged that appellant "did, at or near Virginia Beach, Virginia, on divers occasions between January 1989 and January 1990, commit indecent acts upon the body of [AG], a female under sixteen years of age, not the wife of the said [appellant], by touching and penetrating the vagina of the said [AG] with his hands and fingers, with intent to arouse and gratify the sexual desires of the said [appellant]." AG was the daughter of a woman with whom appellant was living at the time. Born on January 12, 1986, AG was approximately 3–4 years old at the time of the alleged offenses.

At the court-martial, AG was called as a prosecution witness. By the time of trial, June 1992, she was approximately 6½ years old. AG testified via closed circuit television from a remote location. This decision was made by the military judge, based primarily upon the opinion of a child sexual abuse therapist that AG was extremely fearful of appellant and that she would probably suffer significant harm by being confronted by appellant. The correctness of the judge's determination is not here in issue.

On direct examination of AG, after establishing her ability to distinguish between truth and falsehood and her understanding of the need to testify truthfully, trial counsel questioned her as follows:

Q. And did you use to live in Porterville [California]?

A. Yeah.

Q. And where did you live before that?

A. Virginia.

Q. And do you remember the first time Sally [Detective Sally Blagg, *see infra*] came to see you?

A. Yeah.

Q. Was that—is that a long time ago?

A. Yeah.

Q. Have you ever told a lie to Sally?

A. (No audible response.)

Q. Did you—do you remember Sally had a tape recorder?

A. (No audible response.)

Q. Okay. When—when you talked to Sally with the tape recorder, did you tell her the truth?

A. The things that I told her was, I think——

Q. Do you think what you told her was the truth?

A. I don't know. I don't remember what I told her.

Q. Okay. Okay. How do you ... feel about-do you remember Charlie [the familial name for appellant, Lester Charles Casteel]?

A. (No audible response.)

Q. How do you feel about Charlie?

A. Still mad at him.

Q. Why?

A. Because he did mean things to me.

Q. What—what kind of mean things did he do?

A. Spanked us.

Q. Did he do other things too?

A. (No audible response.)

Q. Did he do other bad things to children other than spank them?

A. I don't know.

Q. Do you remember whether Charlie did any other bad things to you?

A. I don't know.

Q. Did—do you think Charlie might have done some bad things to you?

A. I don't know.

Q. Did Charlie ever—do you remember if Charlie ever touched you somehow that you didn't like?

A. I don't know.

Q. Okay.

TC: I don't have any other questions.

DC: I don't have any questions, sir.

MJ: Okay. Thank you very much.

(The witness was excused and withdrew from the closed circuit T.V. room.)

This concluded AG's testimony at the court-martial.

Having anticipated AG's inability or unwillingness to testify, based on information provided by the therapist and recent attempts to interview AG, trial counsel moved *in limine* to introduce a statement made by her much nearer to the time of the alleged events. This prior statement occurred not long after the multiple allegations against appellant came to light, when AG was interviewed in July 1991 by Tulare County, California, Sheriff's Detective Sally Blagg. A portion of that interview was audio-taped, and thereon AG described in considerable detail appellant's alleged sexual abuse of her.

The Government moved admission of this statement as residual hearsay under Mil. R.Evid. 803(24) or 804(b)(5), Manual for Courts–Martial, United States (1995 ed.). Mil.R.Evid. 804(b)(5) provides, in pertinent part:

> (5) *Other exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness.
>
> * * *
>
> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the military judge determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative of the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the

general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence.

Mil.R.Evid. 803(24) is identical, except that Mil.R.Evid. 803 begins, "The following are not excluded by the hearsay rule, even though the declarant is available as a witness."

*In limine,* by agreement of the parties and based on their consistent proffers of fact and on their arguments of law, the military judge ruled provisionally on admission of the hearsay evidence. The focus of the parties and the judge was on the circumstances surrounding the taking of the statement, without reference to corroborating circumstances. At the conclusion of the hearing on the motion, the military judge explained in detail his consideration and balancing of the multiple factors leading to his conclusion that AG's tape-recorded statement to the law enforcement officer met the threshold requirements of the residual hearsay rules. *See* Appendix.

■ After AG's abbreviated testimony, but prior to introducing the tape in evidence, the Government called Detective Blagg as a witness. She described the circumstances surrounding the taking of the statement, and was subjected to defense cross-examination on the point.[2] We hold that this granted issue is without merit—that appellant's confrontation rights were not violated due to the Government's production of AG as a witness and the defense's declination of cross-examination. *United States v. Ureta,* 44 MJ 290 (1996); *United States v. Martindale,* 40 MJ 348, 349 (CMA 1994); *United States v. McGrath,* 39 MJ 158, 163 (CMA 1994). As the Supreme Court has consistently noted, "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *United States v. Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988), quoting *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987), quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294–95, 88 L.Ed.2d 15 (1985); *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Ohio v. Roberts,* 448 U.S. 56, 73 n. 12, 100 S.Ct. 2531, 2543 n. 12, 65 L.Ed.2d 597 (1980).

Regarding the military judge's purely evidentiary decision—not here in issue—to receive the residual hearsay statement, our standard of review is abuse of discretion. *United States v. Pollard,* 38 MJ 41, 49 (CMA 1993); *see generally* S. Childress and M. Davis, *Federal Standards of Review* § 11.02 at 11–5 to 11–9 (2d ed.1992). We are satisfied that the military judge was within his discretion in balancing the reliability factors inherent in the circumstances of this statement. In particular, we are persuaded by the following factors cited by the judge as indicating reliability: First, the victim's fear of appellant and reluctance to say anything bad about him was akin to a declaration against interest because the victim perceived that her situation would be made worse by telling the police what appellant did. Second, the questioning was not suggestive. Third, the victim appeared not to be rehearsed, but to be speaking from memory. Fourth (and most persuasive), the victim demonstrated that she was speaking from memory, rather than trying to please the interrogator, because she contradicted the interrogator on several key occasions. In

---

2. The defense was permitted, without prosecution objection, to show the members a videotaped interview of AG that was made approximately one year after the Government's audio tape. At defense request, the interview was conducted by the same person who had interviewed AG a year earlier, Detective Blagg. The defense argued that the video-tape demonstrated the leading and suggestive nature of Blagg's questioning technique. Though not objecting to the playing of the tape, trial counsel objected to that characterization because it was the defense that provided Blagg the questions. Defense counsel countered that the ground rules were that the detective was to ask the questions provided and then was permitted to ask her own questions. In defense counsel's view, the leading and suggestiveness occurred when the detective was asking her own questions. Spin aside, the video-tape was played to the members by defense counsel after he laid a foundation for them with Detective Blagg. In the video, consistent with her trial testimony, AG—in the main—denied or evaded any questions relating to any sexual misconduct involving appellant.

addition, although statements given *ex parte* to law enforcement officials must always be viewed with suspicion, *United States v. Pollard, supra* at 49; *United States v. Barror,* 23 MJ 370, 372 (CMA 1987), we are likewise satisfied that the military judge adequately assessed that factor.

### ISSUE II

 Appellant also contends that he was not afforded an opportunity to be confronted by AG after her prior, audio-taped statement was played before the court members. Appellant's argument is that he had no ability to cross-examine AG about the statement when she was on the stand since the statement was not received in evidence until after AG was excused. According to the defense, this put appellant in the awkward position of either having to introduce the hearsay statement itself in order to cross-examine AG about it "or he would have had to risk inflaming the members by re-calling the child as a witness in order to perform a full and effective cross-examination." Final Brief at 8.

We deem this issue to be without merit. There is no indication in this record that appellant ever requested an opportunity to cross-examine AG about the prior statement or that he ever was refused such an opportunity. If the mere fact of recalling the victim might have had the effect of inflaming the passions of the court members against appellant, the defense might have asked the military judge to recall her, but they did not. Frankly, we doubt that merely recalling the victim would have had an adverse effect on appellant, although it is conceivable that aggressive, abrasive, or insensitive cross-examination might have. Appellant could not complain, however, if the very exercise of his right of cross-examination damaged him— that is a risk he had to decide whether to take.

Under the circumstances here, however, it is quite likely that the defense concluded they had nothing to gain by cross-examining the victim about the prior statement. Since she had already denied knowledge and memory of not only the events, but even her prior statement, the defense may not have wanted to risk having her remember them, reiterating the statement to the members in the process. In any event, it is clear that cross-examination was available to the defense at all appropriate times.

### ISSUE III

 The final issue relates to an instance of appellant's uncharged misconduct which was received in evidence over defense objection. More precisely, however, the question advanced by appellant pertains to the correctness of the Court of Military Review's decision, ostensibly, that the evidence was admissible on the basis that appellant placed the element of intent in issue when defense counsel cross-examined another victim [TC] about innocent acts of contact between that victim and appellant. Unpub. op. at 4.

Previous to the court-martial, appellant, before the Tulare County, California, Municipal Court, pleaded no contest to, and was found guilty of, a misdemeanor sexual battery on KG, the then 11–year–old daughter of appellant's sometime girlfriend (and also the aforementioned AG's older sister). That offense included an element of touching an intimate part of the victim, against her will, for the specific purpose of sexual arousal, sexual gratification, or sexual abuse.

Specifically, the Government had proffered as follows:

> In January of 1991[KG], the eleven year old daughter of the accused's girlfriend told sheriff's department personnel that the accused had fondled her breast and "french kissed" her.

> [KG] will testify that she was listening to a song about a "cherry kiss" on the radio. The accused told her it was a dirty song. Although she did not ask what a "cherry kiss" was, he picked her up, carried her into the bedroom, and gave her a French kiss, inserting his tongue into her mouth halfway, on the bed.

The Government offered this evidence under Mil.R.Evid. 404(b) as proof of appellant's "motive" and his "intent to arouse and gratify his sexual desires," the latter being an

element of several of the offenses alleged herein under Article 134.

The version of Mil.R.Evid. 404(b) in effect at the time of appellant's trial provided:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

Based upon the Government's proffer, the military judge ruled the evidence was admissible "for the purpose of showing the intent [of] the accused." He reserved judgment on whether it was admissible for other purposes.

In his opening statement, trial counsel described for the members the uncharged misconduct evidence; then he introduced it in evidence in his case-in-chief through the testimony of KG and through appellant's various admissions of that conduct. It appears that trial counsel never actually published to the court members the Tulare County Court documentation of the conviction.

Apparently, the judge ultimately enlarged his ruling, because his limiting instructions on findings were not confined to intent or to the Article 134 offenses. Specifically, the instructions included:

> You are advised that the [uncharged misconduct] evidence may be considered by you for the limited purpose of its tendency, if any, to prove that the accused *intended to gratify his sexual desires* and of its tendency, if any, to prove the *motive of the accused being to satisfy his own sexual desires.*

(Emphasis added.)

The short answer to this granted issue is that the court below did not err in affirming the military judge's ruling on the basis that appellant placed the element of intent in issue because it does not appear that that court based its decision on appellant's somehow placing intent in issue. What that court stated regarding the uncharged misconduct was as follows:

> Applying the criteria used by the U.S. Court of Military Appeals in *United States v. Reynolds,* 29 M.J. 105, 109 (C.M.A.1989), *we find the military judge did not abuse his discretion in deciding to admit this evidence for the purpose of establishing the appellant's intent, particularly as to those offenses charging indecent acts.* [Citations omitted.] As to the appellant's contention that he did not put his intent in issue by merely disputing whether these events ever occurred, we *note* that although the appellant's testimony and his defense counsel's argument on findings ... [were] based on the assertion that the victims were all lying, the defense did bring out other information raising the possibility that the appellant's behavior with at least one of the victims (T) may have been innocent. During the cross-examination of T, the defense elicited testimony that the appellant would rub Ben Gay on T's legs when he (T) would get a "Charlie horse." Record at 101. The indecent acts charged in relation to T were that the appellant "fondled the buttocks and anus of ... [T] with his hands with intent to arouse and gratify the sexual desires of the ... [appellant]." Charge IV, Specification 1.

Unpub. op. at 3–4 (emphasis added).

Whatever the import of the court's "note," it seems clear enough that the holding was that admission of the prior conduct was within the permissible discretion of the military judge on the issue of *mens rea*—which, of course, the Government must prove beyond a reasonable doubt as to each and every offense—and particularly with respect to the specific intent elements of the three indecent act offenses charged.

But even if fairness to the parties permitted us now to change the granted issue and to resolve this case on the propriety of the actual basis of the opinion below, or to go beyond even that and to consider the correctness of the military judge's underlying ruling, it would be a close question as to whether the military judge or the Court of Military Review abused their discretion. Certainly, admissibility of prior sexual uncharged-misconduct evidence has been one of the more vexing areas of the law, *see* E. Imwinkelried,

*Uncharged Misconduct Evidence* §§ 4:15–16 (1984)—so much so that, in any trial under the rules of evidence now in effect, such prior acts are purportedly admissible per se.[3] *See also What is a Plan? Judicial Expansion of the Plan Theory of Military Rule of Evidence 404(b) in Sexual Misconduct Cases,* The Army Lawyer 13 (Dept. of the Army Pamphlet 27–50–235, June 1992).

However, it is not necessary for us to resolve this evidentiary tangle here, because even if we assume, *arguendo,* that error occurred in the receipt of the evidence, we are satisfied, on this record, that appellant was not prejudiced by it. Art.59(a), UCMJ, 10 USC § 859(a). We note that the uncharged misconduct presented in this case was almost trivial in comparison to the serious charges before the court-martial. Indeed, the court-martial featured the testimony of appellant's natural daughter, AC, 11 years old at the time of trial, who described how, over a period of time about 4 years earlier, appellant repeatedly sodomized her and forced her to sodomize him. Further, appellant's natural son, TC, 9 years old at the time of trial, described graphically how appellant had crept into bed with him in the night, pulled down his pants, and anally sodomized him. TC also described multiple other sexual assaults committed by his father. Nevertheless, both AC and TC testified that they missed their dad and wanted to see him again.

Regarding DG and his sister, AG, both were permitted to testify via closed circuit television due to the extent of their fears of appellant and the damage that a confrontation might cause them. DG, 9 years old at the time of trial, was the son of appellant's sometime girlfriend. He described multiple instances of appellant's fondling his genitalia and buttocks, as well as appellant's threatening him with being sent to a foster home if he told his mother. AG's limited testimony and her hearsay statement are described in connection with Issue I, *supra.*

In addition, Carlene Williams, a foster mother who had had custody of TC and AC for over a year before the court-martial, testified about the bizarre, sexually-oriented behavior of the children she had observed and about their other difficulties, such as bed-wetting.

Dr. Scott Van De Putte, a psychologist who specialized in treating sexually abused boys, testified about various behavioral characteristics often exhibited by sexually abused children, and in particular, he described the various unusual behaviors of TC, whom he was treating. In addition, without defense objection, Dr. Van De Putte related many of the statements against appellant made by TC during treatment. *See* Mil.R.Evid. 803(4).

Shirley Panitz–Scott, a psychotherapist specializing in child sexual abuse who was treating DG and AG, testified about the damaged psychological condition of the children, their various behavior manifestations, and their relationship to characteristics frequently observed in sexually abused children.

Finally, the parties stipulated that a pediatric-nurse practitioner who had examined all four of the children would testify, if called as a witness, that she found "nonspecific irregularities" in the hymen and anus of AC, in the anal tissues of DG, in the hymen and anus of AG, and in the anal tissue of TC. According to the stipulation, nonspecific irregularities might be caused by abuse, but they might have other causes, and they neither prove nor disprove sexual molestation.

The defense consisted of character testimony offered by a series of co-workers, su-

---

3. Fed.R.Evid. 414(a) provides:

In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant. Fed.R.Evid. 414(d) defines a child as "a person below the age of fourteen," and it defines child molestation broadly.

Fed.R.Evid. 414 became effective for the Federal Courts on July 9, 1995. *See* Pub.L.No. 103–322, § 320935(b)-(e), 108 Stat. 2137, reprinted in 1994 U.S.Code Cong. & Admin.News; and Historical Notes to Fed.R.Evid. 413, Effective Dates, note following (e) Application, 28 USCA 2255 (1996 Cumulative Annual Pocket Part). By operation of law (Mil.R.Evid.1102), Fed.R.Evid. 414 became part of the Military Rules of Evidence on January 5, 1996.

pervisors, and acquaintances, as well as numerous documents evincing awards and commendations for outstanding Naval service. In addition, appellant testified and emphatically denied committing sexual acts on his own children or those of his girlfriend. His theory about why all the children lied about the sexual misconduct was that he punished them so severely that they wanted him out of the house. Falsely accusing him of vile sexual misconduct was their way of achieving that goal. Appellant implied that it was other adults who had abused the children, and he charged that the children had been led and coerced "[b]y the various people that everybody has seen" into making these false allegations against him.

Picking up on that theme, defense counsel announced to the military judge his theory of the case, as follows:

> [KG] and the French kiss business got Charlie out of the house. The kids liked that. They thought of new things to get Charlie out of the house and keep him out of the house.

He had made the same point to the members during opening argument.

Accordingly, in cross-examining each of the children, as defense counsel put it, "I always ask them the question, 'Did you know what happened to . . . [KG]?' And then I link that [to], 'Have you talked to other people?'" Thus, the uncharged acts against KG fit right in to the defense thesis that the children were making up the accusations against appellant to get him out of their lives.

In sum, this granted issue is without merit in that it is premised on a misstatement of the holding of the court below. Further, even if we expand the granted issue to include the general propriety of receipt of the uncharged-misconduct evidence and assume that it was improperly received, we cannot say on this record that appellant is entitled to relief. Considering the general nature of the uncharged-misconduct evidence in comparison with the charges and the evidence adduced thereon, and given the limiting instructions as to its purpose provided by the military judge, as well as the defense theory of the case, we are persuaded that receipt of

the prior misconduct did not "materially prejudice[ ] the substantial rights of the accused." Art. 59(a). For these reasons, we hold that this granted issue is without merit.

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Judges SULLIVAN, CRAWFORD, and GIERKE, and Senior Judge EVERETT concur.

## APPENDIX

### Military Judge's Findings on Residual-Hearsay Evidence.

MJ: Well, it is the opinion of the court that what is to be addressed are specific guarantees of trustworthiness, regardless of whether you're talking about 803 or 804, and the court, of course, needs to take into consideration all the factors surrounding this case including the age and ability of the alleged victim. Given the gravity of the offense and the nature of the accusation, the court would not wish to allow the statement into evidence unless satisfied that these guarantees were present in this case.

The court feels it must look to several circumstances in order to determine that, one of which is the appearance of the accused [sic]. The court isn't so concerned with availability or unavailability of the person as a witness but rather the possibility of getting other evidence on this same point. Consequently, should the accused [sic] simply now show up, the court would be unable to determine what the accused's—I mean, the victim's responses would be to the various questions and really unable to satisfactorily resolve the issue of other available evidence. So, unavailability plays a role, and the role is whether or not this testimony of the victim is able to establish a lack of any other source of this information, that is, from her; so this is sort of a contingent point. It has been represented that this witness will testify and what this witness will say. If that's different from the representations, then, of

course, the response may be different as well.

Also, there does appear to be some fear of the accused established in the statement by the victim. I agree with the defense. Subsequent interviews that could be used to speculate what level of fear might be present at an earlier date are not probative on this point, but, of course, the interview itself is probative on this point, and there are some places in here where this particular witness does disclose apprehension about the accused and the overall tenor of it certainly demonstrates a reluctance to say anything bad about the accused. There could be various reasons for that. It doesn't automatically make the statement truthful. It doesn't automatically mean that the reason is a fear of reprisal, but it could mean that, and it's a factor, and the court will consider that factor together with other factors.

The court, therefore, finds that the accused—alleged victim did, in fact, possess a measure of apprehension about saying anything detrimental about the accused.

The parties must also take into account that the—that a five-year-old [at the time of the declaration] does not operate the same way as an older individual and that while the accused's constitutional rights aren't going to be brushed to one side to accommodate that, nevertheless, the idea that they can be perennial victims with no recourse is not an accurate assessment either. So, their special circumstances must be given consideration within the contest of the accused's right to confrontation and other matters.

So, in looking over the statement, it's the opinion of the court that the—it was not conducted with a strong or heavy prosecutorial bias. The responses tend to suggest a recitation from memory as opposed to responding to suggestions contained within the questions. There are several questions where the response suggests that it came [from] memory. Let's see if we can pick a couple out as examples here, and there were one or two instances in here

where even the questioner may have posed, "Was it A or B?" the witness said, "Neither. It was C," which I think tends to run contrary to the idea that in eagerness to please the interrogator she's either taking the suggestions posed by the interrogator or picking one or two possibilities suggested. There are many instances of this. So, the court does not feel that the interrogation was heavy-handed or tilted in favor of the prosecution.

Page 3, "Would Charlie touch you on top of your clothes or under your clothes?" "Under my clothes because I had on." "You had on what? A swimsuit?" "Pajamas." This is one example of an answer that seems to the court to be more of a response from memory of events rather than following the suggestion.

Concerning the truth or falsity of the statement, it's correct that there does not appear to be a standard series of preliminary questions designed to determine whether the witness knew the difference between the truth and no truth. However, that is not going to render it defective per se. The responses to the questions generally can be weighed to determine whether or not it appears that an individual responding to them possesses the ability to distinguish between truth and falsity, which, of course, can then also be inferred from the ability of the individual to reason and to understand and respond to questions and the sensibility of it.

I'm not so sure that I'm prepared to say that the level of vagueness is a guarantee of authenticity of—but I would note that it does not appear to have a rehearsed sound, bearing in mind that if these events did not occur, then this particular victim would be lying in all respects, and these responses would then have to be viewed as the product of a rehearsal or deliberate effort to falsify.

The defense has indicated that instead of being motivate to be truthful, the victim was in fear of the accused. If it existed, it would be a motive to lie as a means of removing herself from the proximity of the accused, which the government said that that had already taken place. That's a

possibility, I suppose. How likely it would be under all the circumstances is certainly a weight question, and one must consider the likelihood and the ability of one that age to generate this particular type of tale with or without assistance to do that; but with regard to that, the court does feel that there is an element of fear of displeasing the accused, and, therefore, statements and information which seem to this witness to be likely to displease the accused are hard to give, and I feel this comes through in the statement.

There is no one particular thing. I think everything has to be taken together, and in this particular case, given the age of the accused [sic], the feelings of apprehension and fear—I'm sorry; I keep saying "the accused" when I mean "the alleged victim"—and the fear of the accused, together with the nature of the examination, it not being, in the court's opinion, tainted by heavy prosecutorial bias and there being contained within responses which tend to suggest that the responses were given more from memory, the court feels that this would be in some respects akin to admissions being given against the interest of the person being questioned, which tends, in other areas of hearsay, to satisfy the requirement for some type of guarantee. At her age and with this relationship and with the remarks given, the types of questions being asked and responses given, it is the opinion [sic] that the evidence that she gave that is adverse to the accused was given reluctantly with a measure of fear, but this is a specialized case. This deals with her age and her circumstances and her relationship to this accused. The court wants to be very careful and not try to suggest that first of all, all children are truthful per se or that accusations, because of harm to the person accused, must necessarily be truthful. But the court feels, balancing all the facts in this case, that it does rise to that level; and, therefore, the court will admit it. It is subject, however, to the appearance of the alleged victim and her testifying pretty much as represented. The therapist, and her statement, as noted earlier, it would not be considered for these purposes, it being given subsequent.

So, the government's motion to allow this evidence in as hearsay is granted, or rather, I should say the defense objection to the evidence as being inadmissible is denied or overruled.