BAKER, Judge
(dissenting):
I agree with the majority that the testimony of these witnesses was not admissible under Military Rule of Evidence (M.R.E.) 405(b). And, I share the majority’s general view that where the Government is allowed a permissive inference of wrongdoing from a drug test, an accused should be allowed some leeway in presenting a defense to counter the inference, especially where the Government is free to charge divers occasions, leaving the accused to defend every minute of every day or every week rather than address a specific act or date. And, in the drug test context, there is something symmetrical (and therefore seemingly fair) about an accused balancing the Government’s permissive inference with a permissive inference of his own that permits him to argue that if Witness A did not see drug activity on Tuesday then there must not have been drug activity on Tuesday night.

The Exclusion of the Four Defense Witnesses

The question in this case, however, is not whether the military judge might have permitted Appellant’s “exculpatory witness” testimony on a lenient theory of relevance, but whether the military judge abused his discretion when he did not do so. For the reasons *440 stated below, the military judge did not abuse his discretion when he excluded the testimony of three of the four witnesses. With respect to the fourth witness, whose testimony was improperly excluded, the error was harmless.
As recounted in the majority opinion, four military witnesses would have testified on behalf of Appellant that they were with him and observed his behavior for much of the relevant time frame, and that if the accused had used marijuana they would likely have seen some evidence of it. Three witnesses worked with Appellant, one as his supervisor and two as his co-workers. They would have testified to their observations of Appellant during the daytime hours of the work week, stating that they had never seen evidence of drug use on the part of the Appellant. The fourth witness, Appellant’s close friend and a former Air Force staff sergeant, working as a civilian at Appellant’s duty station at the time, was prepared to testify that he spent significant time with Appellant every weekend and that while he never saw Appellant use drugs or observed him under the influence of drugs, he had observed Appellant’s nephew under the influence of marijuana.
According to defense counsel, such witnesses would have helped to “build our wall of proof one brick at a time.” Trial defense counsel argued for the admissibility of these witnesses’ statements by claiming, “as long as each brick is part of our wall, it is relevant.” The military judge ultimately granted the Government’s motion to exclude this testimony.
It is undisputed that an accused has a constitutional right to present relevant evidence to defend against the charges. That right, however, is not absolute. United States v. Browning, 54 M.J. 1, 9 (C.A.A.F.2000). The burden is on the proponent of the evidence to show admissibility. United States v. Shover, 45 M.J. 119, 122 (C.A.A.F.1996). “ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” M.R.E. 401. Relevant evidence may be excluded, if “its probative value is substantially outweighed by the danger of unfair prejudice .... ” M.R.E. 403. If the military judge weighs the evidence and excludes it, “ ‘appellant has the burden of going forward with conclusive argument that the judge abused his discretion.’” Shover, 45 M.J. at 122 (quoting United States v. Mukes, 18 M.J. 358, 359 (C.M.A.1984)). We will not reverse the military judge’s decision unless appellant persuades us that there was a “ ‘clear abuse of discretion.’ ” Browning, 54 M.J. 1, 9 (C.A.A.F.2000)(quoting United States v. Johnson, 46 M.J. 8, 10 (C.A.A.F.1997)).
The problem with Appellant’s theory of admissibility is that three of the four witness statements were not relevant to the issue of Appellant’s innocent ingestion of drugs.
Appellant did not contest that he had ingested drugs. The Government offered the results of a urinalysis and hair spectrum analysis on this point, and the results were undisputed. Appellant did not take the stand himself, but he did defend on the grounds that he had innocently ingested the drugs, and that the innocent ingestion was more than likely the result of his exposure to his nephew’s and his nephew’s friend’s illegal conduct in his house while Appellant was off-duty. In the words of his civilian defense counsel:
In September of 2000, Master Sergeant Brewer learned that his random urine sample had tested positive____
Master Sergeant Brewer, when learning of his sample, sat in the OSI office stunned, trying to figure out why did this come back positive? “Why was my sample positive for marijuana?”
Fortunately, in the intervening months, Master Sergeant Brewer has been able to find out what likely caused his sample to come back positive.
Now, following the chronology of this, when Master Sergeant Brewer came home that day, he spoke to his 20 year old nephew, Antron Harris — he is called Tron for short — about what had happened. And the next day, Tron suddenly moves out of *441 that house. But Master Sergeant Brewer, at that time, didn’t connect the events at all.
Over the next six or eight months, he spends a lot of time trying to figure out the answer to this question. He is discussing it with various people, researching it, and during one discussion, one unlikely discussion, he learns that Black ’n Milds, Black ’n Milds cigars, the kids will frequently unroll the tobacco from Black ’n Mild cigars and Philly blunt cigars, cheap cigars that you can get at the 7-11, and fill them back up with marijuana so the cigar tobacco and the marijuana tobacco are together in the cigar and smoke that as a way of delivering marijuana to the body.
And he recalls — this is when it starts to click — that Tron, his nephew, smoked Black ’n Mild cigars. He is unable to get a hold of Tron. He also starts thinking about one of the kids, Tron’s friend, who frequently was at the house that summer with Tron, basically his only friend in the area, a kid named D.J. And that kid was — kind of patterned his style, so to speak, after a rapper called — rap star called Eminem____
But in connecting this and starting to think about this, he is thinking about, “Did Tron and D.J. bring marijuana into my house?” And he can’t get a hold of Tron____ But he remembers where D.J. works. He goes to D.J.’s work and he confronts him. Bingo.
Not only did they smoke marijuana, but they ate marijuana. D.J. specifically recalls on one occasion, they put marijuana in some spaghetti sauce and ate it to get high. And that was at the house — Master Sergeant Brewer’s house.

The sauce was kept in Master Sergeant Brewer’s refrigerator like any other food, and it’s probable that by eating this sauce that Tron had spiked with marijuana, Master Sergeant Brewer tested positive for marijuana.

There is no dispute about the science in this case____
The reason we agree with the scientific expert — substantially agree — is that the conclusions that he reaches, the science in this case, the hair and urine testing, are not inconsistent with the scenario I described above. If Master Sergeant Brewer had unknowingly ingested marijuana by eating spaghetti sauce during the summer containing a drug, it’s not likely that he would have felt intoxicated.
But he likely would have tested positive on the urinalysis within a reasonable time after that. Moreover, if he ate it more than once, and many people will eat spaghetti as leftovers et cetera, it is also not inconsistent that his hair would test positive, his pubic hair, two months later, even twelve months later.
Emphasis added.
Subsequently, Appellant offered, and the military judge permitted, the testimony of his nephew’s friend, who admitted to smoking marijuana in the house and making food laced with the drug. However, three of the four excluded witnesses could only testify to Appellant’s conduct at work during duty hours. They were not competent to testify to Appellant’s nephew’s conduct or Appellant’s appearance or activities while outside the workplace. Therefore, it is not evident as to which fact of consequence their proffered testimony would have addressed.
Specifically, it is not evident how their testimony would have made it more or less probable that Appellant’s acknowledged drug ingestion at home, the place where he claimed the ingestion had occurred, was innocent or wrongful. These witnesses did not see it. These witnesses did not speak about it with Appellant. And the proffer made no suggestion that these witnesses were competent to testify regarding the conditions, practices, or behaviors in Appellant’s house.
With respect to the fourth excluded witness who intended to testify about Appellant’s off-duty activities and the suspected drug use of Appellant’s nephew, his testimony was improperly excluded. He would have provided evidence relevant to Appellant’s *442 claim of innocently ingesting marijuana that had been brought into the house by his nephew. However, unlike the majority, I cannot determine that this error was a constitutional violation of Appellant’s due process right to defend against the charges against him.
The right to offer the testimony of witnesses is in plain terms the right to present a defense and the right to present the defendant’s version of the facts. Washington v. Texas, 388 U.S. 14, 18, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Just as an accused has the right to confront the prosecution’s witnesses and challenge their testimony, he has the right to present his own witnesses to establish his defense. Id. at 19, 87 S.Ct. 1920. This right, rooted in the Sixth Amendment, is a fundamental element of due process.
In this case, the Appellant was able to present his defense of innocent ingestion. Though the Appellant never took the stand, his fiancée and a friend of his nephew both testified on his behalf, each asserting that they had never witnessed the Appellant using drugs. Additionally, the nephew’s friend testified at length about marijuana that was smoked in Appellant’s basement and food that was prepared at Appellant’s house that contained marijuana and possibly served to Appellant without his knowledge. While the excluded testimony of the fourth witness might have bolstered that defense, the omission did not deprive Appellant of his right to present it.
When examining an error that is noneonstitutional in nature, we seek to determine whether the error was harmless, not whether it was harmless beyond a reasonable doubt. United States v. Pollard, 38 M.J. 41, 51-52 (C.M.A.1993). The test for nonconstitutional error is whether the error had a substantial influence on the findings. Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Thus, if we conclude that the error substantially influenced the findings, or if we are “left in grave doubt” whether the findings were so influenced, we must reverse. Id. In light of the evidence presented by the Government to rebut Appellant’s theory of innocent ingestion, we can conclude that the exclusion of this witness’ testimony did not substantially influence the guilty findings.
To counter the Appellant’s argument that he had ingested marijuana unknowingly by passively inhaling the smoke caused by his nephew’s drug use in the basement, the Government presented extensive testimony from Dr. Carl Selavka. Dr. Selavka, the Director of the Massachusetts State Police Crime Laboratory and a forensic chemist and toxicologist, testified at length about passive inhalation studies that had been performed with known subjects who did not have prior marijuana in their systems. These studies sought to determine the likelihood of passive inhalation giving rise to positive findings in blood and urine samples. Dr. Selavka stated that such studies demonstrated that the less smoke is ingested and inhaled, the less metabolite will be detected in an individual’s biological tissues. Specifically, he detailed a study in which individuals were exposed to the second hand smoke from four marijuana cigarettes in a very small, closed environment for one hour at a time every day for six days. The individuals, according to the study, did not test positive for the Department of Defense cutoff after such exposure.
Likewise, Dr. Selavka testified, when asked about the likelihood of the Appellant testing positive for marijuana use after ingesting pasta sauce laced with the drug: “In the absence of other ingestions, there is just not enough ingestion of the THC over the time period represented by the hair to logically give rise to the positive finding from the spaghetti sauce scenario itself.” This testimony would have led the members to question Appellant’s theory by bringing to their attention that there were studies that demonstrated that his explanations for his positive drug tests simply were not plausible. Further, it is unlikely that any testimony from the excluded witness about the nephew’s drug use in the house would have negated Dr. Selavka’s testimony or persuaded the members that Appellant’s possible exposure to the drug was somehow distinguishable from the exposure of the individuals who participated in the study.
*443 Additionally, the excluded testimony of the fourth witness would have directly contradicted evidence presented by the Appellant’s fiancée on the issue of drug use in their home. Specifically, she testified that she and the Appellant would not allow drugs to be used in their home. When questioned about whether she knew that Appellant’s nephew and his friend may have been using drugs in the basement, she responded: “I was never aware of it, but we were very strict about— we didn’t allow anything like that in our house. But I never knew of it. He never did it in front of me.” She further stated that in the two years she lived in the home with Appellant, she never smelled anything or saw anything that would have lead her to believe that any marijuana use was occurring in their home, specifically in the basement.
The fourth witness would have testified that he noticed the smell of marijuana on Appellant’s nephew and his friend and that he observed them under the influence of the drug in the home. “I saw there [sic] eyes were red or squinting which I observed in others who were high on marijuana.” He also would have testified that he observed them in possession of drug paraphernalia. “I saw that they had Black and Mild cigars which are commonly used by young people to smoke marijuana.” If this witness had been found credible by the members, it is likely that his observations about the nephew’s drug use in the house would have undercut Appellant’s fiancée’s claim that they were very strict about marijuana not being allowed in the house and that there were no signs of it ever being present in the house, thus weakening his defense.
For these reasons, I do not believe the military judge abused his discretion with respect to three of the witnesses and with respect to the fourth, who was erroneously excluded, I believe that error was harmless. Accordingly, I respectfully dissent on Issue II.

The Military Judge’s Instruction

I also respectfully dissent from the majority’s conclusion on Issue III. To be sure, the instruction at issue is no model of clarity. It is confusing, even to lawyers — or particularly to lawyers — who can dissect the text and legitimately parse alternative meaning from almost every word and phrase. For example, when read in isolation from the remainder of the instructions, the military judge’s statement, “If such an issue [an exception to wrongful use] is raised by the evidence presented, then the burden is on the United States to establish that the use was wrongful” is problematic. Emphasis added. Of course, the burden of proof is always on the United States to establish that use was wrongful, but the use of the word “then” suggests this might not always be the case.
However, the question in this case is whether there was plain and obvious instructional error. This is not a case where the defense counsel objected and proposed alternative language. Nor is this ease resolved by asking whether the instruction could be improved. That is plain and obvious. Among other things, plain English would improve the instruction. If confusion alone was the standard for plain error, then plain instructional error would occur with cascading regularity.
Based on the totality of the instructions provided by the military judge in the specific context of this case, I do not believe there was plain error. The one part of the military judge’s instructions that was unequivocally clear, and repetitive, was the part concerning his instructions that the Government never relinquished its burden to prove all the elements beyond a reasonable doubt. Thus, at the outset of his instructions the military judge stated: “The burden is on the prosecution to establish the guilt of the accused.” And at the close of his instructions the military judge stated:
You are further advised, first, that the accused is presumed to be innocent until his guilt is established by legal and competent evidence beyond a reasonable doubt____ And lastly, the burden of proof to establish the guilt of the accused beyond a reasonable doubt is on the government. The burden never shifts to the accused to establish innocence or to disprove the facts *444 necessary to establish each element of the offense.
These instructions were not confusing, nor did they address obscure points of law. Further, these instructions bracketing the military judge’s instructional packet echoed the ingrained and basic understanding members would already have regarding the Government’s burden of proof. As a result, I do not think it is plain or obvious that the confusing language cited above and in the lead opinion would cause reasonable members to otherwise think the burden of proof was on the Appellant rather than the Government.
Based on the foregoing, I would affirm the decision of the United States Air Force Court of Criminal Appeals.