*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————

**UNITED STATES**
Appellee

**v.**

**Krishil S. PRASAD, Airman First Class**
United States Air Force, Appellant

**No. 19-0412**
Crim. App. No. 39003

Argued March 16, 2020—Decided May 19, 2020

Military Judges: Christina M. Jimenez (rehearing)
and Shelly W. Schools

For Appellant: *David P. Sheldon*, Esq. (argued); *Major Mark J. Schwartz* and *Tami L. Mitchell*, Esq. (on brief).

For Appellee: *Captain Jessica L. Delaney* (argued); *Lieutenant Colonel Brian C. Mason* and *Mary Ellen Payne*, Esq. (on brief); *Lieutenant Colonel G. Matt Osborn.*

Judge OHLSON delivered the opinion of the Court, in which Judges RYAN and SPARKS, joined. Chief Judge STUCKY filed a separate dissenting opinion in which Judge MAGGS joined.

———————

Judge OHLSON delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of two specifications of sexual assault and one specification of abusive sexual contact in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012). The convening authority approved the adjudged sentence of a dishonorable discharge, forfeiture of all pay and allowances, confinement for 30 months, and a reduction to the grade of E-1.

Appellant was tried before our recent decisions held that is it impermissible to use Military Rule of Evidence (M.R.E.) 413 propensity evidence "as a mechanism for admitting evidence of charged conduct to which an accused has pleaded not guilty in order to show a propensity to commit the very same charged conduct." *United States v. Hills*, 75 M.J. 350, 354 (C.A.A.F. 2016); *see also United States v. Hukill*, 76 M.J. 219,

222 (C.A.A.F. 2017).[1] However, the *Hills* and *Hukill* decisions were issued by the time Appellant's case was reviewed by the United States Air Force Court of Criminal Appeals. Citing our holding in those cases, the lower court held that the military judge erred in Appellant's case by permitting evidence of the charged sexual offenses to be used as M.R.E. 413 propensity evidence and by instructing the members accordingly.[2] *United States v. Prasad*, No. ACM 39003, 2017 CCA LEXIS 610, at \*17, 2017 WL 4404557, at \*6 (A.F. Ct. Crim. App. Sept. 5, 2017) (unpublished). Consequently, the Court of Criminal Appeals set aside the finding of guilt and the sentence as to Specification 1 of Additional Charge II[3] and authorized a rehearing. 2017 CCA LEXIS 610, at \*33–34, 2017 WL 4404557, at \*12. However, the Court of Criminal Appeals affirmed the remaining findings of guilt as to Specifications 1 and 3 of the Charge,[4] finding the *Hills* error for those specifications to be harmless beyond a reasonable doubt. 2017 CCA LEXIS 610, at \*33, 2017 WL 4404557, at \*12.

---

[1] We unequivocally reaffirmed the holding of *Hills* in *United States v. Hukill*, stating:

> [U]nder *Hills*, the use of evidence of charged conduct as M.R.E. 413 propensity evidence for other charged conduct in the same case is error, regardless of the forum, the number of victims, or whether the events are connected. Whether considered by members or a military judge, evidence of a charged and contested offense, of which an accused is presumed innocent, cannot be used as propensity evidence in support of a companion charged offense.

76 M.J. at 222.

[2] Although the military judge did not have the benefit of our *Hills* and *Hukill* decisions at the time of Appellant's court-martial, appellate courts "apply the clear law at the time of appeal, not the time of trial." *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010) (citations omitted).

[3] Specification 1 of Additional Charge II alleged that Appellant penetrated KG's vulva with his penis without her consent.

[4] Specification 1 of the Charge alleged that Appellant penetrated KF's vulva with his finger without her consent. Specification 3 of the Charge alleged that Appellant touched KF's groin through the clothing with his penis without KF's consent.

The convening authority subsequently dismissed Specification 1 of Additional Charge II, and ordered a rehearing for the purpose of sentencing Appellant on the affirmed findings, Specifications 1 and 3 of the Charge. *United States v. Prasad*, No. ACM 39003 (reh), 2019 CCA LEXIS 246, at \*2, 2019 WL 2448247, at \*1 (A.F. Ct. Crim. App. June 10, 2019) (unpublished). A general court-martial consisting of officer members sentenced Appellant to a bad-conduct discharge, confinement for 210 days, forfeiture of all pay and allowances, and reduction to the grade of E-1. *Id.* The convening authority approved the new sentence as adjudged. *Id.*

We granted review to determine whether the *Hills* error with respect to Specifications 1 and 3 of the Charge is indeed harmless beyond a reasonable doubt.[5] Although we openly acknowledge that this is a close issue, in light of the relative weakness of the Government's case at trial, the military judge's findings instructions, and trial counsel's findings argument, we hold that the Government has failed to meet its burden of proving that the *Hills* error in this case was harmless beyond a reasonable doubt.

## I. Facts

### Background

Appellant was charged with committing numerous sexual offenses involving five different women.

---

[5] The granted issue is:

> WHETHER THE AIR FORCE COURT ERRED IN ITS FIRST REVIEW OF APPELLANT'S CASE BY AFFIRMING THE FINDINGS OF GUILT FOR SPECIFICATIONS 1 AND 3 OF CHARGE I WHEN IT FOUND PREJUDICIAL ERROR AS A RESULT OF A *HILLS* VIOLATION.

*United States v. Prasad*, 79 M.J. 323 (C.A.A.F. 2019) (order granting review).

Notably, the parties do not dispute that the propensity evidence and the military judge's corresponding instructions were erroneous in light of *Hills*. Therefore, the only issue this Court must decide is whether the *Hills* error prejudiced Appellant.

The military judge ruled, and instructed the members, that the offenses alleged in the Charge,[6] Additional Charge I,[7] and Additional Charge II[8] could be used as M.R.E. 413 propensity evidence. Appellant was acquitted of all charges and specifications except Specification 1 of Additional Charge II, involving KG, and Specifications 1 and 3 of the Charge, involving KF.

## Evidence Presented at Trial

The Government's evidence at trial regarding the two specifications of which Appellant now stands convicted consisted of the testimony of KF and a pretext conversation between KF and Appellant that was conducted using the Snapchat messaging application. The Government did not introduce any physical or forensic evidence and did not present any corroborating witnesses.

### 1. Testimony of KF

At trial, KF testified that on the evening of May 9, 2014, at Grand Forks Air Force Base, North Dakota, she encountered Appellant in the hallway of their dormitory and greeted him with a hug. The two began talking and moved their conversation into Appellant's room. They sat on Appellant's bed

---

[6] The Charge included three specifications in violation of Article 120, UCMJ, 10 U.S.C. § 920. Specification 1 alleged that Appellant penetrated KF's vulva with his finger without her consent. Specification 2 alleged that Appellant kissed KF's breast without her consent. Specification 3 alleged that Appellant touched KF's groin through the clothing with his penis without KF's consent.

[7] Additional Charge I included one specification in violation of Article 80, UCMJ, 10 U.S.C. § 880. The specification alleged that Appellant touched CW's groin with his hand without her consent.

[8] Additional Charge II included five specifications in violation of Article 120, UCMJ. Specification 1 alleged that Appellant penetrated KG's vulva with his penis without her consent. Specification 2 alleged that Appellant penetrated CW's vulva with his finger without her consent. Specification 3 alleged that Appellant touched CW's groin through the clothing with his hand without her consent. Specification 4 alleged that Appellant put his hand underneath KP's shirt and touched her torso without her consent. Specification 5 alleged that Appellant touched JH's torso when she was incapable of consenting to the sexual contact due to impairment by alcohol.

and he began rubbing KF's back and stomach. Eventually Appellant began "spooning" KF while lying down. Appellant then unclasped KF's bra and rubbed and kissed her exposed breasts. KF said nothing but pushed Appellant's hands away.

Next, KF testified that Appellant attempted to put his hands in KF's pants. KF again tried to push him away and said, "No." Appellant nevertheless put his hands in KF's pants and KF said, "Stop or I'm going to hit you." During cross-examination, KF conceded that Appellant may have "thought [she] was joking" because KF is a "sarcastic" person and sometimes her friends "take [her] kind of the wrong way." KF testified that Appellant subsequently penetrated KF's vagina with his fingers. In response, KF "slapped him up against his head." KF described the slap as a "two" on a scale of one to ten.

KF then testified that Appellant pulled his hands out of KF's pants and pinned KF's hands above her head. While in that position, Appellant climbed on top of KF and rubbed his erect penis against KF's thigh and vagina over their clothing.[9] Appellant tried several times to kiss KF on the mouth, but KF told him she would not kiss him. At that point, Appellant said, "You're not enjoying this, are you," and stopped the kissing and touching. The two of them continued to lie in bed together until Appellant fell asleep. KF later testified that Appellant "stopped [the sexual contact] when he realized I didn't want to participate."

## 2. Pretext Snapchat Messages

While KF was reporting the incident to the Air Force Office of Special Investigations (OSI), Appellant contacted her via Snapchat. OSI guided KF in her questions and responses to Appellant, and those messages were subsequently introduced at trial. In pertinent part, the messages stated:

> [KF:] I'm still upset over what happened the other night. What possessed you to do that, I obviously want [sic] interested.
>
> [Appellant:] Nothing

---

[9] Both KF and Appellant had their pants on during this incident.

[KF:] What do you mean? Are you not even going to admit that you were in the wrong or say sorry for what you did?

[Appellant:] Im [sic] am

Just don't know whats [sic] to say.

[KF:] I thought you were my friend… Then you tried to have sex with me. But I would [sic] let you. I told you when you started to play with my boobs I didn't want to. Then you pin[n]ed my hand after I hit you and rubbed yourself against me. And you hid my phone. I only stayed there because I didn't have my phone.

[Appellant:] Im [sic] sorry

. . . .

[KF:] So are you not going to say why you did it? Why you fingered me? Why didn't you stop when I asked you to? If you didn't mean to why did you make it to where I couldn't leave?

[Appellant:] Talk.to me 2day after work in.person

Hopefully I can explain better

Otherwise I understand what I did was wrong

And im.sorry I hurt you

I was pushing it..... idk [I don't know]

I want to have sex and I wa[s].trying to get you in the.mood ..... im.sorry [sic]

[KF:] By fingering after I said no?

[Appellant]: Yup

Idk [I don't know]

What to say

. . . .

[KF:] But may I ask why would pinned [sic] me down after I hit you upside the head? Help me wrap my head around this.

[Appellant:] I thought you were being playful

### 3. Motive to Fabricate

At trial, Appellant's defense regarding the charges involving KF consisted of cross-examination, during which trial defense counsel elicited testimony that KF may have had a motive to fabricate the allegations against Appellant. Specifically, trial defense counsel established the following: (1) KF met her future husband, DF, in April 2013 while both of them were in the Air Force; (2) KF and DF became engaged in July 2013; (3) KF was reassigned to Grand Forks Air Force Base without DF in September 2013; (4) less than one month later, DF ended the engagement because KF was far away and DF did not wish to be in a long-distance relationship; (5) KF wanted to get back together with DF; (6) KF and DF began speaking again in April 2014; (7) the sexual incident involving KF and Appellant occurred on May 9, 2014; (8) as a result of her reporting that Appellant had sexually assaulted her, in August 2014 KF received a compassionate reassignment to the same Air Force base where DF was stationed; (9) one month later, KF and DF were married.

### Findings Instructions

The military judge determined that the evidence raised the defense of mistake of fact as to consent, and he issued an instruction accordingly. The military judge accurately explained to the members, "The mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances."[10]

Additionally, the military judge issued the following instructions to the members regarding the requisite standards for using M.R.E. 413 propensity evidence and for finding Appellant guilty:

> An accused may be convicted based only on evidence before the court, and not on evidence of a general criminal disposition. Each offense must stand

---

[10] If the defense of mistake of fact goes to a general intent element of an offense, "the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances." Rule for Courts-Martial 916(j)(1). Sexual assault by bodily harm in violation of Article 120(b)(1)(B), 10 U.S.C. § 920(b)(1)(B), is a general intent offense. *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019).

on its own, and you must keep the evidence of each offense separate. Stated differently, if you find or believe that the accused is guilty of one offense, you may not use that finding or belief as a basis for inferring, assuming, or proving that he committed any other offense.

. . . .

. . . Further, evidence that the accused committed any sexual offense alleged in the Charge, Additional Charge I, and Additional Charge II may have no bearing on your deliberations in relation to each other unless you first determine by a preponderance of the evidence that is more likely than not an offense alleged in one or more of the specifications under those charges occurred. This evidence has no bearing on Additional Charge III and its Specification.[11]

If you determine by a preponderance of the evidence any offense alleged in the Charge, Additional Charge I or Additional Charge II occurred, even if you are not convinced beyond a reasonable doubt that the accused is guilty of that offense, you may nonetheless then consider the evidence of that offense for its bearing on any matter to which it is relevant in relation to the remaining offenses under the Charge, Additional Charge I and Additional Charge II. You may also consider the evidence of such other sexual offense for its tendency, if any, to show the accused's propensity or predisposition to engage in sexual offenses.

You may not, however, convict the accused of any offense solely because you believe the accused has a propensity or predisposition to engage in sexual offenses. In other words, you cannot use this evidence to overcome a failure of proof in the government's case, if you perceive any to exist. The accused may be convicted of an alleged offense only if the prosecution has proven each element of that offense beyond a reasonable doubt.

---

[11] Additional Charge III included one specification in violation of Article 128, UCMJ, 10 U.S.C. § 928. The specification alleged that Appellant assaulted JH by removing her shirt with his hand.

**Government Findings Argument**

During trial counsel's lengthy findings argument, he relied heavily on propensity evidence and on the preponderance of the evidence standard. In pertinent part, trial counsel told the members:

> [W]e are kind of getting to some, what we call 413 evidence. Other evidence in this case, how about, hey, one woman told me to stop. I kept going. Two women told me to stop. I kept going. Three women told me to stop. I kept going. Four women told me to stop. I kept going. Five women told me to stop. I kept going. How about you learn, that when a woman says, no, she means, no?
>
> . . . .
>
> And this is where we tie in, we start to tie in that propensity evidence, you know, that instruction in there about propensity. . . . And that's the lens through which you have to view this entire court. He has a propensity not to stop when someone says, no. Five women told him, no, and he kept going.
>
> . . . The law realizes that people who engage in sexual offenses may have a propensity to commit that crime again and again and again and what [sic] is what happened here.
>
> . . . .
>
> But, that 413, that propensity evidence, what do we see here again and again? We see another example of the accused not understanding boundaries, not listening to women in this case, no, don't do this, don't touch me. And if you find by a preponderance of the evidence, okay, which is more likely than not, in fact, even if it's beyond a reasonable doubt, if you find it more likely than not that he did this, then you use that evidence in determining that he has a propensity to commit sexual offenses. And you can use that when you are looking at other crimes in this case, the other charges in this case. And the law allows, for sexual offenses specifically, that members can consider that. And you can consider the fact that he doesn't listen. That he ignores, no.
>
> . . . .
>
> . . . [T]he accused assault[ed] five women over a 14 month period, when he knew that he was already

under investigation for the same types of acts in every situation. He continued to take advantage of the situations, to take it vantage [sic] of these women in vulnerable states . . . . And that's a crime. Each individual one is a crime.

## II. Applicable Law

When issues of constitutional dimension are at play, as they are when charged sexual misconduct is improperly used as M.R.E. 413 propensity evidence, the erroneous admission of that evidence and the corresponding instructions to the panel members "must be tested for prejudice under the harmless beyond a reasonable doubt standard." *Hukill*, 76 M.J. at 222; *see also Hills*, 75 M.J. at 357. This Court "reviews de novo the issue of whether a constitutional error was harmless beyond a reasonable doubt." *United States v. Kreutzer*, 61 M.J. 293, 299 (C.A.A.F. 2005). And it is the Government that bears the burden of proving that a constitutional error is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967); *United States v. Tovarchavez*, 78 M.J. 458, 462 (C.A.A.F. 2019).

"The inquiry for determining whether constitutional error is harmless beyond a reasonable doubt is whether, beyond a reasonable doubt, the error did not contribute to the [accused's] conviction or sentence." *Hills*, 75 M.J. at 357 (internal quotation marks omitted) (quoting *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006)). This "standard is met where a court is confident that there was no reasonable possibility that the error might have contributed to the conviction." *Tovarchavez*, 78 M.J. at 460 (citing *Chapman*, 386 U.S. at 24). On the other hand, where a court "cannot be certain that the erroneous propensity instruction did not taint the proceedings or otherwise 'contribute to the defendant's conviction or sentence,'" there is prejudice. *United States v. Williams*, 77 M.J. 459, 464 (C.A.A.F. 2018) (quoting *Hills*, 75 M.J. at 357). Where constitutional error contributes to a conviction, "the conviction cannot stand." *Kreutzer*, 59 M.J. at 779 (quoting *United States v. Pollard*, 38 M.J. 41, 52 (C.M.A. 1993)).

In analyzing whether a *Hills* error was harmless beyond a reasonable doubt, this Court has evaluated both the strength of the Government's case against the accused, and the content

of the military judge's findings instructions. With respect to the strength of the Government's case against the accused, where there has been "overwhelming" evidence of Appellant's guilt, this Court has been convinced beyond a reasonable doubt that the accused was convicted "on the strength of the evidence alone" and "that an erroneous propensity instruction did not contribute to the verdict." *United States v. Guardado*, 77 M.J. 90, 94 (C.A.A.F. 2017). However, where the Government's case is "weak," this Court "cannot know whether the instructions may have tipped the balance in the members' ultimate determination" and thus will find that any error was "not harmless beyond a reasonable doubt." *Hills*, 75 M.J. at 358; *see also Williams*, 77 M.J. at 464. Likewise, where it is merely "certainly possible" that the accused was convicted solely based on properly admitted evidence, this Court will not conclude that a *Hills* error was harmless. *Guardado*, 77 M.J. at 94–95.

Furthermore, with respect to the content of the military judge's findings instructions, where an instruction "clearly [tells] the [members] that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity," this Court has held that there is "no risk the [members] would apply an impermissibly low standard of proof." *Williams*, 77 M.J. at 463 (internal quotation marks omitted) (quoting *Hills*, 75 M.J. at 357). But, where a military judge gives a "propensity instruction that explicitly refer[s] to the preponderance of the evidence standard," this Court "cannot deny that the military judge's 'muddled . . . instructions potentially implicated fundamental conceptions of justice under the Due Process Clause' and heightened 'the risk that the members would apply an impermissibly low standard of proof.'" *Williams*, 77 M.J. at 463–64 (internal brackets omitted) (quoting *Hills*, 75 M.J. at 357).

### III. Analysis

In the instant case, the Government's evidence at trial was not particularly strong, the military judge's findings instructions were confusing, and the trial counsel's mistaken arguments regarding the preponderance of the evidence standard and propensity evidence were pervasive. Taking these points together, we feel compelled to conclude that the

Government has failed to meet its burden of proving that the *Hills* error in Appellant's case was harmless beyond a reasonable doubt.

### Strength of the Government's Case

Appellant stands convicted of two offenses: Specifications 1 and 3 of the Charge.[12] Specification 1 alleges that Appellant penetrated KF's vulva with his finger without her consent, and Specification 3 alleges that Appellant touched KF's groin through the clothing with his penis without her consent. As explained below, we conclude the Government has failed to prove that it presented at trial such "overwhelming" evidence of Appellant's guilt with respect to these offenses that this Court should find beyond a reasonable doubt that Appellant was convicted "on the strength of the evidence alone." *Guardado*, 77 M.J. at 94.

### Specification 3: Touching Penis to KF's Groin

The Government's case against Appellant with respect to Specification 3, alleging that Appellant touched his penis to KF's groin over their clothing without her consent, was far from "overwhelming." First, the evidence at trial supported a mistake of fact as to consent defense because it squarely raised the issue of whether Appellant honestly and reasonably believed that KF consented to the sexual contact. It is true that before Appellant escalated the sexual contact beyond rubbing and kissing KF's exposed breasts, KF told him, "Stop or I'm going to hit you." However, KF herself admitted during cross-examination that Appellant may have "thought [she] was] joking" because she is often "sarcastic" and even her friends "take [her] kind of the wrong way." KF additionally

---

[12] Appellant was also convicted of a third offense at court-martial—Specification 1 of Additional Charge II—but the Court of Criminal Appeals set aside the finding of guilt with respect to that specification. *Prasad*, 2017 CCA LEXIS 610, at *33, 2017 WL 4404557, at *12. Specifically, because that specification "hinged on [KG]'s credibility" and defense counsel "substantially attacked" KG's credibility at trial, and because there was no corroborating admission of guilt by the accused, the lower court was not convinced the *Hills* error was harmless beyond a reasonable doubt. 2017 CCA LEXIS 610, at *31–32, 2017 WL 4404557, at *11.

clarified that when she later hit Appellant, she did so using the force of just a "two" out of ten.

Furthermore, portions of the Snapchat messages introduced at trial corroborated the notion that Appellant thought KF was only joking. Specifically, KF sent a message to Appellant stating, "But may I ask why would pinned [sic] me down after I hit you upside the head? Help me wrap my head around this." Appellant responded, "I thought you were being playful." Moreover, KF admitted that during the Article 32, UCMJ, investigation, she testified that *as soon as Appellant "realized* [*she*] *didn't want to participate" in the sexual activity, he stopped touching and kissing her*.

Second, we stress that an accused can properly be convicted of a sexual offense on the word of a single victim alone. In the instant case we must note, however, that the Government presented no corroborating forensic or physical evidence of KF's account of the penis-to-groin touching, and no witnesses who could independently verify KF's account of the circumstances surrounding this incident. And importantly, we must further note that these uncorroborated allegations were significantly undermined by a motive to fabricate and by other deficiencies in the Government's evidence as cited throughout this opinion. Because of the totality of these circumstances, it cannot be said that there was "overwhelming evidence of Appellant's guilt" in the context of a *Hills* error evaluation of prejudice. *See, e.g.*, *Williams*, 77 M.J. at 464; *Guardado*, 77 M.J. at 94; *Hills*, 75 M.J. at 358.

Third, the Government's introduction of the Snapchat messages between Appellant and KF did not strengthen its case with respect to Specification 3. KF alluded to the penis-to-groin touching in the following exchange with Appellant:

> [KF:] I thought you were my friend… Then you tried to have sex with me. But I would [sic] let you. I told you when you started to play with my boobs I didn't want to. Then you pin[n]ed my hand after I hit you and rubbed yourself against me. And you hid my phone. I only stayed there because I didn't have my phone.
>
> [Appellant:] Im [sic] sorry

KF's use of the phrase "rubbed yourself against me" may have referred to the penis-to-groin touching. However, it also may have referred to Appellant's other actions during the sexual encounter. Therefore, the ambiguity of KF's phrasing, paired with the litany of other accusations contained in her message, render Appellant's response of "Im sorry" weak evidence of corroboration. Indeed, as can be seen from the Snapchat exchange, it is not clear whether Appellant was specifically apologizing for touching his penis to KF's groin through their clothing, or whether he instead was apologizing for merely hiding KF's phone. Moreover, even if Appellant intended to apologize for touching his penis to KF's groin through their clothing, such a "text message apology do[es] not unassailably establish his consciousness of guilt." *Tovarchavez*, 78 M.J. at 469.

Fourth, in a broader context, the Government's case against Appellant was far from "overwhelming" given the defense's effective cross-examination of KF establishing a potential motive to fabricate. Specifically, trial defense counsel laid out for the members the following timeline: in the fall of 2013, DF ended his engagement to KF because DF did not want to be in a long-distance relationship; in April of 2014, KF and DF began talking to one another again; in May 2014, KF reported Appellant for sexual assault and abusive sexual contact; in August 2014, KF received a compassionate reassignment as a result of her report of sexual assault and was relocated to the same Air Force base as DF; one month later, KF and DF got married. While it certainly is possible that the panel members viewed this timeline as a mere coincidence, it also is possible that this potential motive to fabricate sowed such doubt in the minds of the members that they would have acquitted Appellant but for the improperly admitted propensity evidence and erroneous propensity instruction.

In sum, the Government's case against Appellant for Specification 3 was not particularly strong and falls short of constituting "overwhelming" evidence of Appellant's guilt. *Guardado*, 77 M.J. at 94.

## Specification 1: Digital Penetration

The shortcomings noted in the strength of the Government's case against Appellant with respect to Specification 3

are likewise shortcomings—although perhaps to a lesser degree—in the strength of the Government's case in regard to Specification 1, which alleges that Appellant digitally penetrated KF's vulva without her consent. As such, we conclude that the Government has failed to present "overwhelming" evidence of Appellant's guilt for Specification 1, and thus has failed to meet the high bar of demonstrating beyond a reasonable doubt that the accused was convicted "on the strength of the evidence alone." *Guardado*, 77 M.J. at 94.

Similar to our analysis pertaining to Specification 3, we conclude that Appellant's Snapchat messages, like the "text message apologies" in *Tovarchavez*, do "not unassailably establish . . . consciousness of guilt." 78 M.J. at 469 (citation omitted). In *Tovarchavez*, this Court determined that the following message exchange did not rise to the level of a confession of guilt:

> [Victim:] I'm not going to allow you to make me your sex toy anymore
>
> . . . .
>
> [Appellant:] What are talking about, this is just weird ill [sic] leave it at the company.
>
> [Victim:] What's weird is I told you no and you still forced me to have sex anyway
>
> [Appellant:] Im [sic] sorry for what ever happened between us . . . . [F]rom now on Im [sic] going to leave you alone. Im [sic] sorry.
>
> [Victim:] If your [sic] sorry why did you do it
>
> [Appellant:] I made a mistake by crossing the line, and I'm sorry for that, you deserve much more than that.

78 M.J. at 461 (alterations in original). These messages are not markedly different from Appellant's Snapchat messages with KF regarding the digital penetration allegations. Their exchange follows in pertinent part:

> [KF:] So are you not going to say why you did it? Why you fingered me? Why didn't you stop when I asked you to? If you didn't mean to why did you make it to where I couldn't leave?
>
> [Appellant:] Talk.to me 2day after work in.person

15

Hopefully I can explain better

Otherwise I understand what I did was wrong

And im.sorry [sic] I hurt you

I was pushing it.....idk [I don't know]

I want to have sex and I wa[s].trying to get you in the.mood.....im.sorry [sic]

[KF:] By fingering after I said no?

[Appellant:] Yup

Idk [I don't know]

What to say

On the one hand, these "text message apologies could be interpreted as establishing consciousness of guilt" and thus be viewed as a confession to sexual assault. *Tovarchavez*, 78 M.J. at 469. But on the other hand, when the Snapchat messages are viewed in the context of KF's testimony that Appellant may have thought she was joking, that KF smacked Appellant only lightly in response to the digital penetration, and most importantly, that KF explicitly conceded that Appellant *stopped* his sexual contact *as soon as he realized she did not want to participate,* these messages "could also have been . . . from someone who knows they have acted inappropriately, but not criminally." *Id.* (internal quotation marks omitted) (citation omitted). As such, we conclude that Appellant's acknowledgment of the digital penetration and apology to KF does not constitute "overwhelming" evidence of Appellant's guilt, and is not sufficient to render the *Hills* error harmless beyond a reasonable doubt. *Guardado*, 77 M.J. at 94.

Furthermore, when the Snapchat messages are viewed in conjunction with Appellant's credible mistake of fact as to consent defense—corroborated by KF's own testimony—and KF's potential motive to fabricate, "it is difficult to be certain that Appellant was convicted . . . on the strength of the evidence alone." *Guardado*, 77 M.J. at 94. As was true for Specification 3, the Government's case for Specification 1 was not particularly strong and does not surmount the bar of "overwhelming" evidence of Appellant's guilt. *Id.*

**Findings Instructions**

In addition, the military judge's muddled findings instructions created a significant "risk that the members . . . appl[ied] an impermissibly low standard of proof." *Williams*, 77 M.J. at 463–64 (internal quotation marks omitted) (quoting *Hills*, 75 M.J. at 357). Although the military judge correctly instructed the members, "The accused may be convicted of an alleged offense only if the prosecution has proven each element of the offense beyond a reasonable doubt," the remainder of the military judge's instructions conflated the beyond a reasonable doubt standard and the preponderance of the evidence standard. A particularly problematic section of the instructions states:

> If you determine by a *preponderance of the evidence* any offense alleged . . . occurred, *even if you are not convinced beyond a reasonable doubt* that the accused is guilty of that offense, you may nonetheless then consider the evidence of that offense for its bearing on *any matter to which it is relevant . . . .*

(Emphasis added.) In accordance with these instructions, it is indeed possible that the members could have found Appellant guilty under a preponderance of the evidence standard rather than beyond a reasonable doubt. *Hills*, 75 M.J. at 357. Because "[w]e cannot know whether the instructions may have tipped the balance in the members' ultimate determination," we cannot hold that the error in this case was harmless beyond a reasonable doubt. *Id*. at 358.

And finally, in the course of this prejudice analysis it is appropriate to note that the trial counsel exploited—to the considerable detriment of Appellant—the confusion surrounding the military judge's preponderance of the evidence instructions, as well as the negative inferences to be drawn from the putative propensity evidence. Specifically, trial counsel made the following two arguments:

> [T]his is where we tie in, we start to tie in that propensity evidence, you know, that instruction in there about propensity. . . . *And that's the lens through which you have to view this entire court.* [*The accused*] *has a propensity not to stop when someone says, no.* Five women told him, no, and he kept going.

. . . The law realizes that people who engage in sexual offenses may have a propensity to commit that crime again and again and again and what [sic] is what happened here.

. . . .

But, that 413, that propensity evidence, what do we see here again and again? We see another example of the accused not understanding boundaries, not listening to women in this case, no, don't do this, don't touch me. *And if you find by a preponderance of the evidence, okay, which is more likely than not, in fact, even if it's beyond a reasonable doubt, if you find it more likely than not that he did this, then you use that evidence in determining that he has a propensity to commit sexual offenses.* And you can use that when you are looking at other crimes in this case, the other charges in this case. And the law allows, for sexual offenses specifically, that members can consider that. And you can consider the fact that he doesn't listen. That he ignores, no.

(Emphases added.)

In light of these arguments, there is a considerable likelihood that the panel members followed the Government's urging and applied the military judge's erroneous findings instructions in such a manner that improper propensity evidence regarding acquitted conduct was used to overcome some reasonable doubts the panel members had about Appellant's guilt regarding the two specifications of which he was convicted.

Although no longer before us on appellate review, we cannot overlook the fact that the members convicted Appellant of a third specification involving a different victim, KG.[13] If Appellant's only convictions had been those involving KF, perhaps we would have been swayed by the argument that the members convicted Appellant of only those charges that were supported by the independent evidence consisting of the Snapchat exchange between Appellant and KF. This scenario might have served to rebut the appearance that improper pro-

---

[13] The conviction involving KG was Specification 1 of Additional Charge II.

pensity evidence tipped the scales in the members' guilt determinations. However, the conviction involving KG forecloses such a conclusion. Indeed, this particular conviction serves to undermine the Government's position. Specifically, the Court of Criminal Appeals set aside the finding of guilt for Specification 1 of Additional Charge II because the strength of the evidence against Appellant was deficient. *Prasad*, 2017 CCA LEXIS 610, at *31–32, 2017 WL 4404557, at *11. Although the lower court did not set aside the specification for factual insufficiency pursuant to Article 66(d), UCMJ, 10 U.S.C. § 866(d) (2012), it did find that the Government's evidence was not strong enough to convince the court that the *Hills* error was harmless beyond a reasonable doubt. *Id.* Thus, in deciding to convict Appellant of certain offenses where there were significant deficiencies in the Government's evidence, it appears that the members may have been influenced by the military judge's clearly erroneous instructions regarding propensity evidence.

## IV. Conclusion

Although it is a close question, in light of the totality of the points raised above we conclude that this Court "cannot be certain that the erroneous propensity instruction did not taint the proceedings or otherwise 'contribute to the defendant's conviction or sentence.'" *Williams*, 77 M.J. at 464 (quoting *Hills*, 75 M.J. at 357). Therefore, the Government has failed to meet its burden of demonstrating that the error was harmless beyond a reasonable doubt. Consequently, the findings of guilt and sentence for both Specifications 1 and 3 of the Charge are set aside. The record is returned to the Judge Advocate General of the Air Force. A rehearing is authorized.

Chief Judge STUCKY, with whom Judge MAGGS joins, dissenting.

The military judge instructed the members that evidence of one charged sexual offense could be used to establish an accused's propensity to commit another charged sexual offense, and the trial counsel so argued during two minutes of a ninety-minute closing argument. In light of our decision in *United States v. Hills*, this was error. 75 M.J. 350 (C.A.A.F. 2016). The majority concludes the Government failed to establish the error was harmless beyond a reasonable doubt. I respectfully dissent.

"A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003) (per curiam) (internal quotation marks omitted) (citations omitted).

> To say that an error did not "contribute" to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous, but rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.

*United States v. Chisum*, 77 M.J. 176, 179 (C.A.A.F. 2018) (internal quotation marks omitted) (citations omitted).

Although each offense at issue must stand on its own, viewing the facts in chronological order is important because those of the earlier offense inform the second. When Appellant started his attempts to seduce KF, she was completely passive, allowing him to remove her bra and massage and kiss her breasts without protest, all while she was using her cell phone. It was only after he put his hands in her pants that she protested, told him to stop, and threatened to hit him. When he used his finger to penetrate her vulva, she hit him in the head. Nevertheless, Appellant removed his hand from her pants, pinned her hands over her head, climbed on top of her and rubbed his clothed erection against her groin while she avoided his attempts to kiss her.

The majority concludes that the prosecution's case was not particularly strong, that the evidence supports a mistake of

fact as to consent defense, and that this case is similar to *United States v. Tovarchavez*, 78 M.J. 458 (C.A.A.F. 2019). I disagree.

In *Tovarchavez*, DNA established that the appellant and the alleged victim had engaged in sexual acts. When she texted him that she would not be his sexual toy, he replied that he didn't know what she was talking about. She accused him of forcing her to have sex after she said "no." He replied that he was "sorry for what ever happened between" them and that he would leave her alone in the future. *Id.* at 461. When asked why he did it, he said he "made a mistake by crossing the line." *Id.* We concluded that the *Hills* error was not harmless beyond a reasonable doubt, as the appellant's admissions were vague and consistent with someone who knew he had "acted inappropriately, but not criminally." *Id.* at 469 (internal quotation marks omitted) (quoting *United States v. Tovarchavez*, 2018 CCA LEXIS 371, at *22, 2018 WL 3570591, at *9 (A. Ct. Crim. App. July 19, 2018)).

Appellant's Snapchat admissions are different in character. He acknowledged understanding what he did was "wrong" and apologized for hurting her. He further texted:

> [Appellant:] I was pushing it….. idk
>
> I want to have sex and I wad.trying [sic] to get you in the mood …..im.sorry [sic]
>
> [KF:] By fingering after I said no?
>
> [Appellant:] Yup.

Despite KF's protest and threat to hit him if he didn't stop, he nevertheless used his finger to penetrate her vulva. Appellant knew she wasn't consenting, but he wasn't taking "no" for an answer.

Appellant's next steps further demonstrated that he knew KF was not consenting. After she carried out her threat to hit him in the head if he did not stop, he removed his hand from her pants, pinned both her hands above her head, and rubbed his clothed erect penis over her groin, while she tried to avoid him kissing her lips. Appellant later claimed in his text he thought she was being "playful." Under the facts and circumstances of this case, that simply does not pass the smell test.

KF was willing to indulge Appellant but only so far. There was nothing playful about their interaction; no banter, invitations, giggling, or laughter. She was passive until he crossed the line, when she insisted that he stop. It is clear KF was not consenting to this activity and Appellant knew it. Unlike in *Tovarchavez*, Appellant's admissions are not consistent with those of someone who knows he may have acted inappropriately but not criminally.

And the evidence simply does not support a conclusion that Appellant held an honest and reasonable mistake of fact that KF was consenting after she told him to stop. As the military judge instructed, a mistake of fact as to consent for these Article 120 offenses required Appellant to have honestly and reasonably believed that KF consented to the sexual activity. *United States v. McDonald*, 78 M.J. 376, 379–80 (C.A.A.F.), *reconsideration denied*, 79 M.J. 94 (C.A.A.F. 2019). Even if Appellant was so clueless as to somehow believe that KF was consenting, that belief was not reasonable in light of the facts and circumstances explained above. The evidence presented at trial established beyond a reasonable doubt that no reasonable person would believe that KF was consenting to the sexual activity.

Furthermore, the court members' findings demonstrate that they were not impressed by the propensity instruction or trial counsel's propensity argument. Instead, they appear to have focused on the military judge's admonitions that they must consider each offense on its own and they could not convict Appellant "of any offense solely because you believe the accused has a propensity or predisposition to engage in sexual offenses." There was sufficient evidence to prove beyond a reasonable doubt that Appellant committed each of the offenses he was alleged to have committed against KF. But the court members acquitted him of abusive sexual contact by kissing KF's breasts, the only one of the three offenses not corroborated in his Snapchat conversations with her. Rather than using the other offenses as evidence of the abusive sexual contact offense, the members followed the military judge's instructions, considered the abusive sexual contact offense on its own, and acquitted Appellant of that offense.

Based on the strength of KF's testimony, the corroborating Snapchat messages, the minimal propensity argument, and the court members' findings, the erroneous instruction and arguments were harmless beyond a reasonable doubt. The errors were "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Chisum*, 77 M.J. at 179 (citation omitted).